**In re Milton T. ROSENFIELD, Petitioner.**
**No. 119-57.**

United States District Court
District of Columbia.
Dec. 13, 1957.

James J. Laughlin, Washington, D. C., for petitioner.

Oliver Gasch, U. S. Atty., and Oscar Altshuler, Asst. U. S. Atty., for District of Columbia, Washington, D. C., for the United States.

HOLTZOFF, District Judge.

This proceeding came on for hearing on a return to a writ of *habeas corpus*. The petitioner, having been acquitted in this court on five indictments on the ground of insanity, was committed to Saint Elizabeths Hospital for the mentally ill. He now seeks an unconditional release from the institution.

The petitioner was charged in five indictments with housebreaking and larceny. Each specified a separate housebreaking and larceny connected therewith. The cases were tried jointly on December 3, 4, 5, 6 and 7, 1956, and the trial resulted in a verdict of not guilty on the ground of insanity. A recent statute approved on August 9, 1955, makes it mandatory for the court to commit to a hospital for the mentally ill any person who is acquitted on the ground of insanity. Accordingly, the court on December 7, 1956, ordered the defendant to be confined in Saint Eliza-

beths Hospital.[1] On April 19, 1957, the petitioner was liberated under a conditional release order and has been living in this city since that time. He now prays for an unconditional release.

The statutory provisions governing this subject form a part of the Act of August 9, 1955, to which reference has already been made. They read as follows (District of Columbia Code, Title 24, Section 301(e)):

"Where any person has been confined in a hospital for the mentally ill pursuant to subsection (d) of this section, and the superintendent of such hospital certifies (1) that such person has recovered his sanity, (2) that, in the opinion of the superintendent, such person will not in the reasonable future be dangerous to himself or others, and (3) in the opinion of the superintendent, the person is entitled to his unconditional release from the hospital, and such certificate is filed with the clerk of the court in which the person was tried, and a copy thereof served on the United States Attorney or the Corporation Counsel of the District of Columbia, whichever office prosecuted the accused, such certificate shall be sufficient to authorize the court to order the unconditional release of the person so confined from further hospitalization at the expiration of fifteen days from the time said certificate was filed and served as above; but the court in its discretion may, or upon objection of the United States or the District of Columbia shall, after due notice, hold a hearing at which evidence as to the mental condition of the person so confined may be submitted, including the testimony of one or more psychiatrists from said hospital. The court shall weigh the evidence and, if the court finds that such per-son has recovered his sanity and will not in the reasonable future be dangerous to himself or others, the court shall order such person unconditionally released from further confinement in said hospital * * *".

As this is a new statute, there appear to be no reported cases interpreting it and, therefore, a thorough consideration of its construction and application seems desirable. Such a scrutiny can be commenced best by a discussion of the numerous questions and the various circumstances involved in the general situation that led to the passage of the 1955 Act. The problem of dealing with insane criminals is fraught with difficulties. It has widespread ramifications and broad implications. To incarcerate such persons in prison would be inhumane. Moreover, it would be unfair to other prisoners, a vast majority of whom necessarily are sane human beings. On the other hand, to turn insane criminals free would be dangerous both to the public and to themselves. For the protection of the public as well as for their own protection, they should be confined and treated in mental hospitals. Troublesome questions arise, however, in endeavoring to decide when they become ready for release from the institution. Dangerous lunatics, seemingly cured, have been known to go on a rampage after being set at liberty. On the other hand, criminals, who have successfully pleaded insanity, have been known to claim that they are of sound mind promptly after serious criminal charges no longer confronted them. Yet to turn them free forthwith would be not only stultifying, but would also mean that guilty persons would go unwhipped of justice, thus dealing a blow at the administration of the criminal law and possibly encouraging other criminals.

 There is a presumption that a state of mind once established continues to exist until the contrary appears. Con-

---

I. District of Columbia Code, Title 24, § 301(d):

"If any person tried upon an indictment or information for an offense, * * is acquitted solely on the ground that he was insane at the time of its commission, the court shall order such person to be confined in a hospital for the mentally ill."

sequently, in the case of a defendant acquitted on the ground of insanity, the mental illness is presumed to continue until a complete recovery is convincingly proved. He should be kept under observation in the institution for a sufficiently long period, even after a cure appears, in order to make certain that the apparent cure is not merely temporary, or as it is known in psychiatry, a period of remission. Safety of the public demands nothing less, while the defendant has no right to complain at being taken at his word. The protection of the public, with due regard to the rights of the accused, is the primary aim of the criminal law. It is necessary to prevent a plea of insanity from becoming an escape route from the consequences of a criminal conviction by substituting a short stay in a modern mental hospital for a long term of imprisonment in a penitentiary, or possibly even for the death penalty.

That this is no mere theoretical possibility appears from the fact that during the past several years, there has been in this jurisdiction a marked increase in the number of motions for mental examinations on the part of persons charged with crime. At times such applications have been made on the eve of trial. It may be said in passing that as one of the consequences of these tactics the average period between indictment and trial has been frequently lengthened, although this Court keeps its criminal docket in a current condition.[2]

The problems confronting trial courts and juries in determining whether a defendant should be acquitted on the ground of insanity are difficult, complex and at times baffling. The definition of insanity recently adopted in this jurisdiction is general, indefinite and puzzling in practical application. It requires a prolonged and involved explanation. It is a test that has been rejected in every jurisdiction, Federal and State, in which its adoption has been proposed, and exists only in the State of New Hampshire, which originated it many years ago, and in the District of Columbia, which recently followed the example of New Hampshire.[3]

The difficulties are multiplied by the requirement that once the slightest evidence, or a mere scintilla of evidence, of the defendant's insanity at the time of the commission of the crime has been introduced, the burden is cast on the Government to prove sanity as of that date beyond a reasonable doubt.[4] In this respect the onus to be borne by the Government in the District of Columbia is heavier than that in other Federal courts, since elsewhere the defendant must introduce some evidence of insanity, i. e., substantial evidence,—not merely a scintilla—, before the Government is required to establish mental competency affirmatively beyond a reasonable doubt.[5] These complications are further augmented by the uncertainties surrounding the testimony of psychiatrists. It is no criticism of psychiatry, which indeed has made great strides in our time, or any reflection on individual psychiatrists, for many of whom this court has great admiration, to say that psychiatry is far from an exact science, much less so than other

---

2. A striking illustration of the fact that the plea of insanity has been misused is found in the case of Durham v. United States, 94 U.S.App.D.C. 228, 214 F. 2d 862, 45 A.L.R.2d 1430; 99 U.S.App. D.C. 132, 237 F.2d 760, where the defense of insanity was interposed. After a reversal of the conviction at the second trial and when the case came up for trial a third time in this Court, 130 F.Supp. 445, the defendant pleaded guilty, thus admitting by necessary implication that he was sane at the time of the crime.

3. United States v. Fielding, D.C., 148 F. Supp. 46, 52, footnote 8; Wright v. United States, D.C.Cir., 250 F.2d 4, dissenting opinion, Miller, J., footnote 3.

4. Tatum v. United States, 88 U.S.App. D.C. 386, 389, 190 F.2d 612.

5. Davis v. United States, 160 U.S. 469, 485, 16 S.Ct. 353, 40 L.Ed. 499. The general Federal doctrine is that some evidence means substantial evidence, since ordinarily the "scintilla rule" does not apply in Federal courts.

branches of medicine. Differences of opinion among psychiatrists when testifying in open court are, of course, a common occurrence. The doubts thus created are accentuated by the fact that even the same group of psychiatrists may testify differently on the same topic at different times. For example, until a few weeks ago, members of the medical staff of an outstanding mental hospital were in the habit of testifying that a psychopathic or sociopathic personality did not constitute a mental disease. Recently, however, a formal announcement was made by the acting head of that institution that thereafter members of the staff would express the opinion that such a mental state is in fact a mental disease. In other words, the concept was changed overnight by the psychiatrists themselves.

Occasionally opinions of psychiatrists are in a sense speculative, since in some cases they attempt to reconstruct the state of the defendant's mental health as of the date of the crime, on the basis of an examination made by the psychiatrist months, and sometimes years, after the event. Some psychiatrists are more daring in expressing such opinions than others of their more cautious and conservative brethren. Frequently such opinions are contradicted by contemporaneous observations of eye witnesses and by accounts of what the defendant said or did at the time in question.

In the light of all these developments, it is not surprising that resort to the defense of insanity has become much more common in this jurisdiction than it had been in prior years. It is not beyond the realm of possible comtemplation that occasionally a sane, dangerous criminal may be found not guilty on the ground of insanity and might be turned loose ready to resume his depredations on the community, if he is not incarcerated somewhere for an appreciable length of time. Fortunately, a saving grace is frequently found in the common sense of juries. Reliance on the sound judgment and keen discernment of the average jury and confidence in its ability to do substantial justice is not often misplaced.

▮ It was against this background that the Congress passed the Act of 1955, which, first, made it mandatory for the court to commit to a mental hospital any defendant in a criminal case who was found not guilty on the ground of insanity; and, second, which placed certain safeguards against the release of such a person from the mental hospital after he is committed thereto. It is obvious that the Congress had a twofold purpose: first, to protect the public; and, second, to discourage unfounded pleas of insanity. The statute governing the release of such a person from the mental hospital must, therefore, be construed in a manner that would best effectuate these objectives.

The statute, which has been quoted above, imposes two requirements as inexorable conditions precedent to the granting of an unconditional release of a person who has been committed as a result of a verdict of not guilty on the ground of insanity. The first prerequisite is that the Superintendent of the hospital certify that the person has "recovered his sanity", that in the opinion of the Superintendent he will not in the reasonable future be dangerous to himself or others, and that in the opinion of the Superintendent he is entitled to his unconditional release. In this case the Superintendent of the hospital has filed with the Clerk of this Court a certificate complying with the requirement of the statute and, therefore, the first condition precedent has been satisfied. It should be noted in passing that originally the Superintendent filed a certificate stating that the petitioner "has recovered sufficiently". The Court ruled that this certificate did not comply with the statute, since a sufficient recovery may mean a partial and not a total recovery. Subsequently to this ruling, the amended certificate was filed.

The second and final stage of the release procedure is an order of the Court authorizing such action. It is clear from the text of the statute that the Congress

did not contemplate that the court should approve the certificate of the Superintendent of the hospital *pro forma,* for the Act, which has been quoted, empowers the court in its discretion to hold a hearing at which evidence as to the mental condition of the person involved may be submitted. It is further provided that the court shall weigh the evidence and if the court finds that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others, that the court shall order such person unconditionally released from further confinement in the hospital. Obviously, therefore, the statute places the final responsibility on the court.

Accordingly, in the case at bar, the court directed that a hearing be held before it. At that hearing testimony was given by a psychiatrist, who was the Assistant Chief of the division of the hospital in which the petitioner had been confined and treated; by the petitioner's father; and by the petitioner himself. The Court was indeed impressed with the fact that as a result of modern psychiatric treatment received at the hands of skilled psychiatrists in Saint Elizabeths Hospital, the petitioner made great progress toward reaching mental balance, a proper attitude toward society, and adjustment to the community. He is now steadily employed in a restaurant owned and operated by his sister. His own testimony discloses that he has acquired an insight into his own past shortcomings and has apparently changed his attitude toward his fellow man. There is no doubt that the progress made by this patient is a tribute to modern psychiatric methods, as well as a credit to the accomplishments of the splendid institution in which he was confined, and to the individual psychiatrists who treated him. The hospital psychiatrist testified unequivocally that the petitioner had recovered his sanity and that he would not be dangerous to himself or others within the reasonable future.

■ A serious question arises, however, on an examination of the formal return filed on behalf of the Superintendent of the hospital to the writ of *habeas corpus.* To be sure, the return concludes with a statement that the respondent believes that the petitioner has reasonably demonstrated an ability to adjust in the community, that he has recovered from his psychosis, that he will not be dangerous to himself or others within the reasonable future, and is entitled to his unconditional release. Yet this concluding statement is preceded by an allegation, also contained in the return, that the respondent, as well as other members of the medical staff of Saint Elizabeths Hospital, are of the opinion that the petitioner *"is* suffering from schizophrenic reaction, chronic undifferentiated type, but that since the petitioner's readmission to Saint Elizabeths Hospital on December 2, 1956, the psychosis has been in *remission".* This statement seems to contradict the averment that the petitioner recovered from the psychosis, and it likewise contradicts the oral testimony. The term "remission" at best means a temporary recovery, perhaps a temporary, partial recovery. For example, Webster's New International Dictionary, 1949 Edition, defines remission as "a temporary and incomplete subsidence of the force or violence of a disease or of pain". The American Illustrated Medical Dictionary, 1941 Edition, defines the term as "a diminution or abatement of the symptoms of a disease; also the period during which such diminution occurs". Thus, the formal return filed in this proceeding on behalf of the Superintendent of the hospital, is much more guarded than either the certificate or the oral testimony.

In the light of these circumstances and in view of the caution that should be exercised by the court in cases of this type, the court reaches the conclusion that the matter is not yet ripe for the granting of an unconditional release.

Writ discharged and petition denied.