Comer **BLOCKER**, Appellant,

v.

**UNITED STATES of America**,
Appellee.

No. 14274.

United States Court of Appeals
District of Columbia Circuit.

Argued April 6, 1959.

Decided June 25, 1959.

Wilbur K. Miller, Circuit Judge, dissented.

Mr. Howard C. Westwood, Washington, D. C., with whom Mr. J. William Doolittle, Jr., Washington, D. C. (both appointed by this Court) was on the brief, for appellant.

Mr. John D. Lane, Asst. U. S. Atty., with whom Mr. Oliver Gasch, U. S. Atty., and Messrs. Carl W. Belcher and Frederick G. Smithson, Asst. U. S. Attys., were on the brief, for appellee.

Mr. Francis J. Ortman, Washington, D. C. (appointed by this Court as amicus curiae) urged reversal.

Before PRETTYMAN, Chief Judge, and EDGERTON, WILBUR K. MILLER, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN and BURGER, Circuit Judges, sitting en banc.

PER CURIAM.

Comer Blocker was indicted, tried and convicted for murder in the first degree. His defense was insanity. Three psychiatrists testified at his trial, two called by the defense and one by the prosecutor. All three were on the staff at St. Elizabeths Hospital, an institution owned by the Federal Government and operated by it for the mentally ill. Blocker had undergone observation there for some sixty days or more. The testimony of the doctors called by him was based upon that observation. The testimony of the other doctor, for the Government, was based upon a three-hour examination at the District Jail. The latter found nothing wrong with Blocker. The other two doctors concluded that he suffered from a sociopathic personality disturbance and chronic alcoholism and that his intelligence was about midway between defective and "dull normal". All three doctors testified that a sociopathic personality disturbance was not considered to be a

mental disease or defect. The verdict of guilty-as-indicted was returned October 22, 1957.

On November 18, 1957, less than a month after this verdict was returned, the Assistant Superintendent of St. Elizabeths Hospital testified in another case [1] that he and the Superintendent of the Hospital were then agreed that people suffering from sociopathic personality disturbance should be "labelled" as diseased, as mentally ill, mentally sick, suffering from mental disease. Counsel for Blocker promptly moved for a new trial on the basis of this new medical evidence. The motion was denied. We think it should have been granted. Blocker, his life at stake, was entitled to a verdict based upon the most mature expert opinion available on an issue vital to his defense.

With respect to the testimony of the experts which may occur upon a retrial, we direct attention to those portions of our opinion in Carter v. United States [2] which dealt with this matter. We also call attention to our admonitions in Durham v. United States [3] that "We do not, and indeed could not, formulate an instruction which would be either appropriate or binding in all cases"; we included discussion and material from which proper instructions could be fashioned for a particular case. In that connection we quoted from the Royal Commission Report as follows:

"There is no *a priori* reason why every person suffering from any form of mental abnormality or disease, or from any particular kind of mental disease, should be treated by the law as not answerable for any criminal offence which he may commit, and be exempted from conviction and punishment. Mental abnormalities vary infinitely in their nature and intensity and in their effects on the character and conduct of those who suffer from them. Where a person suffering from a mental abnormality commits a crime, there must always be some likelihood that the abnormality has played some part in the causation of the crime; and, generally speaking, the graver the abnormality, * * * the more probable it must be that there is a causal connection between them. But the closeness of this connection will be shown by the facts brought in evidence in individual cases and cannot be decided on the basis of any general medical principle." [4]

For the foregoing reasons and purposes the judgment of the District Court has been reversed and the case remanded for a new trial.

WILBUR K. MILLER, Circuit Judge (dissenting).

We had oral argument in this case on April 6, 1959. On the same day, without stopping to write an opinion, my brothers summarily entered an order reversing the judgment and remanding the case for a new trial. They have now filed the foregoing opinion containing one brief decisional paragraph, which I quote:

"On November 18, 1957, less than a month after this verdict was returned, the Assistant Superintendent of St. Elizabeths Hospital testified in another case * that he and the Superintendent of the Hospital were then agreed that people suffering from sociopathic personality disturbance should be 'labelled' as diseased, as mentally ill, mentally sick, suffering from mental disease. Counsel for Blocker promptly moved for a new trial on the basis of this new medical evidence. The motion was denied. We think it should have been granted. Blocker, his life

---

1. See testimony in United States v. Leach, Crim. No. 450–57, D.D.C., and in Rosenfield v. Overholser, D.C., 157 F.Supp. 18.

2. 102 U.S.App.D.C. 227, 236–237, 252 F. 2d 608, 617–618 (1957).

3. 94 U.S.App.D.C. 228, 241, 214 F.2d 862, 875, 45 A.L.R.2d 1430 (1954).

4. Royal Commission on Capital Punishment 1949–1953 Report (Cmd. 8932) 99 (1953).

at stake, was entitled to a verdict based upon the most mature expert opinion available on an issue vital to his defense.

"* See testimony in United States v. Leach, Crim.No. 450–57, D.D.C., and in Rosenfield v. Overholser, D.C., 157 F.Supp. 18."

The majority's precipitate action will receive the plaudits of many, for it has recently become apparent that the statute requiring the death penalty for first degree murder in the District of Columbia does not meet with popular approval.[1] But, being a statute, it is indisputably the "law of the land," as the saying goes, and must be applied so long as it is in effect, regardless of the sentiment and scruples of those who oppose it.

I dissent from the action of the majority in holding the motion should have been granted and in reversing and remanding for a new trial. My view is that the District Court lacked jurisdiction to entertain the motion for a new trial and that, therefore, this court has no power in the premises. But I do not base my dissent upon that ground alone. For, if the District Court could disregard peremptory provisions of the Federal Rules of Criminal Procedure and entertain the motion for a new trial—and my brethren implicitly hold that it could—I think the trial court correctly denied the motion and that this court has erroneously reversed its action. The several reasons which impel me to that conclusion will be discussed after the question of jurisdiction has been examined.

Before discussing these points, however, I think it well to recount the facts of the killing and the trial, because the majority have been content merely to say Blocker was convicted of murder in the first degree. The record shows he

carefully planned and coldly committed a pitiless killing, and then attempted to escape the consequences by claiming it was done accidentally and that, anyway, he was a chronic alcoholic who ought not to be held responsible.

On April 5, 1957, Comer Blocker was and had been for some time separated from his common law wife, Frances Hall, by whom he had five children. He was living in Philadelphia and she was residing with several of her children in a small apartment in the District of Columbia. Evidence for the Government showed that in Philadelphia Blocker had bought a shotgun and a carrying case for it; and that, on April 5, he brought the gun with him to the District of Columbia and hid it in a wooded area. About 11:00 o'clock that night, having repossessed the gun, he knocked on the door of his wife's apartment. The knock was answered by his son Chester, then 14 years old, who attempted to prevent his father from entering when he saw him with a gun. Blocker threatened the boy and backed him into the bedroom where his mother was. As Frances attempted to close and lock the door, a shotgun blast came through it and struck her body.[2] Blocker then entered the room and shot his wife a second time, inflicting wounds on her face and chest.[3] Almost immediately afterward, when he was apprehended, Blocker told an officer that he had come from Philadelphia to kill his girl friend and that he had done so. It does not appear that he was intoxicated that night.

At his trial, which was conducted from October 16, 1957, through October 22, Blocker contended that he had meant no harm, that the first shot through the door was caused by contact with the boy, and that the second shot in the bedroom

1. On May 22, 1959, by an almost unanimous vote, the Judicial Conference for the District of Columbia Circuit adopted a resolution advocating repeal of the mandatory death sentence for murder in the first degree. The Conference's action received editorial commendation and produced favorable reaction in the United States Senate.

2. An autopsy revealed the presence of wood splinters in one of her wounds together with the pellets from the shot-gun shell.

3. These wounds did not contain splinters of wood.

was completely accidental. He also advanced the inconsistent defense of insanity.

Blocker introduced as witnesses in his defense two psychiatrists from the staff of St. Elizabeths, Drs. William Cody and Morris Platkin. They had examined him several times during the period of 60 days in which he was committed to the hospital for observation. Dr. Cody said:

"With respect to his mental condition, we made a diagnosis of Mr. Blocker of sociopathic personality disturbance and chronic alcoholism.

\* \* \* \* \* \*

"\* \* \* The kind of personality deviation which is termed sociopathic personality disturbance has to do with what is thought of as a personality defect.

"Now, this is not the same thing as a mental defect or a mental illness. It is more a long standing personality disturbance characterized in many cases by a lack of conscience, a lack of moral responsibility, and inability to profit from experience.

"These people are frequently [in] anti-social difficulties, and chronic alcoholics also fall within this group. The two diagnoses are really one, *the chronic alcoholism being the kind of sociopathic personality disturbance that we felt this man represented.*" (My emphasis.)

Dr. Platkin, who examined Blocker three times in September, 1957, found him to have a sociopathic personality disturbance and to be a chronic alcoholic, but said he did not find that Blocker had a mental disease or defect.

Lay evidence introduced by Blocker to indicate insanity consisted largely of his brother's statements that Blocker "always seemed to be a little different from the rest of them," that he "wouldn't go to school," and that "he always wanted to be by himself." Consequently the lay evidence was negligible, and it is extremely doubtful whether the appellant overcame the presumption of sanity.

Nevertheless, the District Court instructed on insanity as though the issue had been raised.

The Government introduced Dr. William Cushard, also of St. Elizabeths' staff, who had examined Blocker on May 26, 1957, during a period of more than three hours. He found nothing wrong whatever with the prisoner and said he did not have any mental disease or defect and did not have a sociopathic personality disturbance, either on the day of examination or on April 5. He also said that a sociopathic personality disturbance is not a mental disease or defect, thus agreeing with the two psychiatrists who had been introduced by Blocker.

Blocker took the stand and testified in his own behalf. In his somewhat lengthy testimony he displayed a remarkable memory of incidents which he said had occurred throughout a number of years, and was particularly clear as to the occurrences on April 5, as he purported to relate them. He also remembered and admitted that between 1940 and 1956, both included, he had been convicted of five criminal offenses. One of these was carrying a concealed weapon, three were assault, and one was assault with a dangerous weapon.

On October 22, 1957, the jury found Blocker guilty of murder in the first degree, thus finding that he had killed his wife purposely, of deliberate and premeditated malice, and while he was "of sound memory and discretion." The jury was fully aware of the fact that in the District of Columbia the punishment of murder in the first degree is death by electrocution, and had been instructed on the included lesser offense of second degree murder and on the defense of insanity. Nevertheless, after weighing all the evidence, it found Blocker guilty of murder in the first degree.

With this background, I shall first discuss the jurisdictional question, and then the several reasons why the trial court was correct in denying the motion for a new trial, if it had jurisdiction to entertain it.

1. If the Federal Rules of Criminal Procedure are to be applicable in cases of murder in the first degree, then the appellant's motion for a new trial was clearly out of time and could not be considered by the District Court.

Under the provisions of Rule 33 of the Criminal Rules, which I reproduce in the margin,[4] a motion for a new trial on the ground of newly discovered evidence may be filed within two years after the verdict; but a motion on any other ground must be filed within five days after the verdict unless, *within the five days*, an extension of time is granted.

The verdict of the jury was returned October 22, 1957. On October 28,[5] the appellant moved to extend until November 25, 1957, the period within which he might file a motion for a new trial, this extension being asked so that he might obtain a transcript of the record. On November 25, 1957, the appellant moved for a further extension until December 6, 1957, within which to file a motion for a new trial, this time saying he desired to interview the witnesses. This motion was granted by the District Court on November 25, long after the five-day period within which it was authorized to do so. The motion for a new trial, which the majority have granted, was finally filed on December 6, 1957.

It was clearly beyond the competence of the District Court to grant a further extension pursuant to the motion of November 25. A reading of Rule 33 makes it quite clear that the motion for a second extension was not timely and should not have been granted or even entertained by the District Court, if the Rule is to be applied in first degree cases. The District Court's compliance with Rule 33 is insisted upon in Rule 45(b) of the Criminal Rules, which I also reproduce in the margin.[6]

Of course these time limitations do not apply if the motion for a new trial was based on newly discovered evidence. But it was not so based; had it been, the applications for extensions of time would have been unnecessary. It was founded on what the majority are content to call "new medical evidence." The fact is it was based on evidence which was not only not newly discovered, but was not even new, as will later fully appear.

2. Psychiatrists who would testify that sociopathic personality disturbance is a mental disease were available at the time of Blocker's trial, but none was called as a witness by him. Such evidence is therefore not newly discovered, nor is it "new medical evidence." That witnesses having this opinion could easily have been produced by Blocker at his trial in October, 1957, is seen in the fact that in 1952, five years before Blocker killed his wife, the American Psychiatric Association published a Diagnostic and

4. Rule 33, 18 U.S.C.A. is as follows:
"The court may grant a new trial *to* a defendant if required in the interest of justice. If the trial was by the court without a jury the court may vacate the judgment if entered, take additional testimony and direct the entry of a new judgment. A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for a new trial based on any other grounds shall be made within 5 days after verdict or finding of guilty or within such further time as the court may fix *during the 5-day period."* (My emphasis.)

5. Although October 28 was the sixth day after the verdict, the motion was timely under the five-day provision of Rule 33 because the fifth day, October 27, was Sunday.

6. Rule 45(b) is as follows:
"(b) Enlargement. When an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) with or without motion or notice, order the period enlarged if application therefor is made before the expiration of the period originally prescribed or as extended by a previous order or (2) upon motion permit the act to be done after the expiration of the specified period if the failure to act was the result of excusable neglect; *but the court may not enlarge the period for taking any action under Rules 33,* 34 *and 35,* except as otherwise provided in those rules, or the period for taking an appeal." (My emphasis.)

Statistical Manual of Mental Disorders [7] in which it said, at page 38:

"Individuals to be placed in this category [sociopathic personality disturbance] are ill primarily in terms of society and of conformity with the prevailing cultural milieu, and not only in terms of personal discomfort and relations with other individuals. * * * "

The mere fact that this statement was made in the Manual published by the American Psychiatric Association shows that at least as early as 1952 there were many psychiatrists among its members who were of the opinion that a sociopathic personality disturbance is a mental disease.

Thus Blocker could have, had he chosen to do so, used expert witnesses who would say that a condition such as that ascribed to him by his two psychiatrists is in fact a mental illness. Instead he chose to use the two psychiatrists from St. Elizabeths who said the condition they attributed to him is not a mental disease or defect. In that opinion they were typical of the other psychiatrists on the Hospital staff who entertained the same view. But Blocker was by no means limited to the St. Elizabeths' staff in his choice of witnesses, although the majority opinion seems to indicate that he was.

In my opinion, this motion for a new trial should not be granted—even though this is a first degree murder case—merely to give the accused an opportunity to present evidence which he could easily have adduced at the original trial, had he or his able counsel wanted to do it.

3. The evidence in the Leach case given by Dr. Addison Duval, Assistant Superintendent of St. Elizabeths Hospital, when properly understood and construed, simply is that it was the consensus [8] of the St. Elizabeths' staff that sociopathic personality disturbance is not a mental disease or defect and, for that reason, it was the policy of the Hospital to insert in its records after a diagnosis of sociopathic personality disturbance the words "without mental disorder."

Dr. Duval then said that as of November 18, 1957, he and the Superintendent had agreed that sociopathic personality disturbance *may be* a mental disease, as a result of which they decided to omit from the diagnosis the concluding words "without mental disorder" and to "let the diagnosis stand on its own feet." He did not say the consensus of their colleagues had changed in the same fashion. He also said—and I later quote his language—that sociopathic personality disturbance *may become* insanity, if it has symptoms thereof "engraved" upon it. Dr. Duval went on to say he and the Superintendent were then agreed that people suffering from sociopathic personality disturbance should be "labelled" as mentally ill.

I suppose the Superintendent and his Assistant, acting alone, have the right to formulate and record the official Hospital diagnosis. But surely they cannot control the professional thinking of their 50 or 60 colleagues. The idea that two men could require the other members of the staff to testify contrary to their convictions is a shocking one, and I do not believe the Superintendent and his Assistant pretend to have such authority.

I think it reasonable, therefore, to conclude that Dr. Duval's testimony meant nothing except that as of that day he and the Superintendent, in addition to those members of the American Psychiatric Association mentioned in a preceding paragraph, would be available to testify that sociopathic personality disturbance is a mental disease. This was not "new medical evidence" because, as pointed out heretofore, other psychiatrists who would have said the same thing were available at the time of Blocker's trial.

---

7. This Manual was discussed by the Assistant Superintendent of St. Elizabeths when he testified in the Leach case, and was cited by him as supporting his new opinion.

8. Consensus means "unanimity or general agreement of opinion." There are probably 50 or 60 psychiatrists on the staff at St. Elizabeths Hospital.

4. At the original trial, the Government proof sufficiently showed that Blocker's "sociopathic personality disturbance" did not cause him to kill his wife. He introduced no evidence in rebuttal to show that his disturbed personality *did* cause the killing.[9]

Despite the difficulty of establishing the negative of causation, the Government proved beyond a reasonable doubt that the crime was not the product of the sociopathic personality disturbance. On that subject I quote from the testimony of Dr. Cushard:

"Q. [By Mr. Smithson] You found, sir, no mental disease or defect present on May 26, and it is your best opinion, sir, that there were none present as of May 5th; is that right?

"The Court: You mean April 5th.

"Q. [By Mr. Smithson] April 5th. I had the wrong date. April 5th, 1957? A. Yes, sir.

"Q. Then, sir, I take it it would be likewise your opinion that the defendant was able as of April 5, 1957, to know right from wrong and to embrace the right and reject the wrong, according to your best opinion? A. In my opinion, he was able to; yes, sir."

9. It has been held, erroneously I think, that when "some evidence" tending to show insanity has been introduced by the defendant, he has overcome the presumption of sanity and thrown upon the Government the burden of proving beyond a reasonable doubt that he was sane when the wrongful act was committed. I think insanity should be an affirmative defense, as it is in many states. Also erroneously, in my opinion, it has been held that insanity with "some evidence" of causation *is* a defense, unless the Government proves it was *not* the cause of the wrongful act; thus the prosecution has the task of establishing a negative. This should be part of an affirmative defense.

The legal principles concerning the burden of proof, as they presently exist, are well stated in Carter v. United States, 102 U.S.App.D.C. 227, 234, 252 F.2d 608, 615 (1957):

The right-wrong and "irresistible impulse" tests of criminal responsibility are not ruled out by the Durham case,[10] nor does it provide any additional criterion, as I shall show. I suggest that one who knows right from wrong but freely and deliberately chooses to do the wrong cannot be heard to say that some mental disease or defect caused his criminal conduct. Certain it is that Blocker made no effort to contradict Dr. Cushard's statement. Neither of his psychiatrists said he could not distinguish right from wrong, or that he could not refrain from doing wrong; and neither said he killed his wife because of the sociopathic personality disturbance which they attributed to him.

The testimony of Dr. Duval at the Leach trial, on the basis of which a new trial has been ordered here, does not say a sociopathic personality disturbance is or may be the cause of a criminal act. In fact, his testimony indicates the contrary, because he said that one with such a disturbance knows right from wrong and is able to embrace the right and reject the wrong unless he has additional symptoms "engraved" on his disturbed personality which cause him to be psychotic or insane.[11]

Moreover, in his motion for a new trial, Blocker did not say he would pre-

" * * * To claim exemption from responsibility for a criminal act an accused must assert two conditions: (1) that he suffered from a mental disease or defect and (2) that his alleged criminal act was the product or result of that disease or defect. When this defense is raised, the response of the Government may be one or the other (or both alternatively) of two propositions: (1) that the accused had no mental disease or defect or (2) that even if the accused had a mental disease or defect the alleged criminal offense was not the product of the infirmity. The burden is upon the Government to establish beyond a reasonable doubt whatever position it (the Government) takes upon the issue. * * * "

10. Durham v. United States, 94 U.S.App. D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430 (1954).

11. This evidence is quoted later in this opinion.

sent witnesses to prove, in rebuttal of the evidence for the prosecution, that a person with sociopathic personality disturbance does not know right from wrong, or that the disturbance will or even may make it impossible for him to adhere to the right and reject the wrong. He was content to say he could now offer witnesses *from St. Elizabeths* who would testify that his personality disturbance due to alcoholism is a mental disease.

5. At the risk of some repetition, I think it necessary to demonstrate that the testimony of Dr. Addison Duval in the Leach case on November 18, 1957, has been erroneously construed as being that on that day St. Elizabeths Hospital adopted a new policy which required its psychiatrists to testify that sociopathic personality disturbance is a mental disease. I quote from the evidence of Dr. Duval:

"Q. Tell me, Doctor, has there been any determination by your institution as to whether or not persons with merely sociopathic personality disturbance are with or without mental disorder?

\* \* \* \* \* \*

"A. Late in 1954, after the Durham decision, we had a staff meeting at which the psychiatrists discussed what should be the uniform, if possible, type of name which we would give to this particular group of cases, known as sociopathic personality disturbance, namely, whether we would report them as with mental disorder or without mental disorder.

"This is a difficult medical question which I would be glad to discuss, if you might wish me to do it.

"The decision at that time was that in the agreed-upon consensus of our psychiatric staff this group of individuals so classified would be considered without mental disorder.

\* \* \* \* \* \*

" \* \* \* [I]t was the policy of the hospital to insert the words 'without mental disorder' after the

diagnosis of sociopathic personality disturbance in our records."

Dr. Duval said the Diagnostic and Statistical Manual on Mental Disorders, published in 1952 by the American Psychiatric Association, refers to sociopathic personality disturbance as a disease. He then added, " \* \* \* [A]s of today we are, the superintendent and I have both agreed that hereafter we will eliminate from our records the words 'without mental disorder,' where the diagnosis of this particular group of personality disorders is made. And we will hereafter *let the diagnosis stand on its own feet."* (My emphasis.)

It is to be noted that Dr. Duval and the Superintendent did not decide to put in the diagnosis of sociopathic personality disturbance the words "with mental disease" or any equivalent expression. Instead he said, " \* \* \* [W]e will hereafter let the diagnosis stand on its own feet." In other words, Duval was saying that the new policy of eliminating from the records the words "without mental disorder" simply means that in his and the Superintendent's opinion a sociopathic personality disturbance may or may not be without mental disorder. That is the reason, of course, that he and the Superintendent decided to let each diagnosis stand on its own feet; because one case might require a diagnosis including the words "with mental disorder," and another might require the diagnosis to say "without mental disorder."

Dr. Duval also said:

"You would have, the next group below the psychoses would be the neuroses, very few of whom get into mental hospitals. Some few do. Then as you move towards the normal you would run into this group that we are talking about. These are the individuals who are somewhere in between what has been called normal and what has been called insane or psychotic.

"Now heretofore, a number of psychiatrists have not been willing to call these people by the name

'mental disease' or 'disorder.' They have called them abnormal people. But they have not been willing to use the word 'disease' or 'disorder.' [12]

"We now believe that this is incorrect, and that these people should be labelled as disordered or diseased, if you prefer the word, but that when we say that we must be very careful to point out that this is a different quantitative and qualitative type of physical and mental abnormality in the same way that you would look at physical disease."

In the foregoing excerpt Dr. Duval was giving only his own opinion and that of the Superintendent. He said that one who has a sociopathic personality disturbance is "somewhere in between what has been called normal and what has been called insane or psychotic." But, having said such disturbance may or may not be a mental disease, he later said, somewhat inconsistently, that a sociopathic personality disturbance is a mental disease. Plainly, however, it is in his view a mental disease lying between the normal and the insane; in other words, he was not using the term "mental disease" as synonymous with insanity.

Dr. Duval testified further as follows:

"Q. And would you say, sir, a sociopathic personality disturbance, someone with that abnormality knows the difference between right and wrong? A. I do.

"Q. Are they able to restrain, or embrace the right and reject the wrong? A. They usually will. I would qualify that by saying it could be they would have additional symptoms engraved onto this kind of personality which then would throw them either up into this upper bracket which we usually call psychotic or insane. In other words, I am saying these people may also become insane.

"Q. While they are abnormal in that they are slightly removed from what has been called normalcy, before they become what we generally refer to as insane they must have some additional psychotic symptoms, is that correct? A. That is correct."

This emphasizes the fact that Dr. Duval distinguished between sociopathic personality disturbance and insanity. He said, "[T]hese people [those with sociopathic personality disturbances] may also become insane;" that is, they may also become insane if "additional symptoms [are] engraved onto this kind of personality which then would throw them into this upper bracket which we usually call psychotic or insane." (My emphasis.) There was no proof at the trial that Blocker had any such additional symptoms "engraved" on his personality. And the motion for a new trial did not offer to produce any witness who would testify to that effect.

Thus Dr. Duval made it clear that he thinks—and I believe psychiatrists generally agree—there is a long scale of mental conditions ranging from the normal at one end to the psychotic or insane at the other, with many gradations in between. He also stated that one with sociopathic personality disturbance has a mental disease but is "next to normal," and is not psychotic or insane. So I say that, according to Dr. Duval, one may have a mental disease without being psychotic.

A majority of my brothers said in Lyles v. United States,[13] "The issue of insanity having been fairly raised, the jury may return one of three verdicts, guilty, not guilty, or not guilty by reason of insanity." This is unquestionably

12. I suggest this means that a number of other psychiatrists have been willing heretofore to "call these people by the name 'mental disease' or 'mental disorder.'" Dr. Duval's statement is further proof that psychiatrists having that opinion were available to Blocker as witnesses in October, 1957.

13. 103 U.S.App.D.C. 22, 25, 254 F.2d 725 (1957), certiorari denied 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958).

true. The third of the three possible verdicts is recognized in and permitted by subsection (c) of § 24–301, D.C.Code (1951, Supp. VII 1959), and the disposition of a defendant so acquitted is provided for in subsection (d). These subsections of the statute are as follows:

"(c) When any person tried upon an indictment or information for an offense, or tried in the juvenile court of the District of Columbia for an offense, is acquitted solely on the ground that he was insane at the time of its commission, that fact shall be set forth by the jury in their verdict.

"(d) If any person tried upon an indictment or information for an offense, or tried in the juvenile court of the District of Columbia for an offense, is acquitted solely on the ground that he was insane at the time of its commission, the court shall order such person to be confined in a hospital for the mentally ill."

It is seen from the Lyles opinion, however, that a mere verdict of insanity is not permitted: in order to return a verdict of not guilty by reason of insanity, the jury must find not only that the defendant was insane when he did the wrongful act but also that his insanity caused him to commit it; that is, that he had a mental disease or defect which amounted to insanity as the law uses the word, in that it prevented him from acting rationally and from understanding the nature of his act and the natural consequences of it; or destroyed his ability to refrain from doing what he knew was wrong. That is the meaning of a verdict of not guilty *by reason of* insanity.

It is apparent then that a finding of insanity alone is not enough to justify such a verdict; it must be insanity which caused the wrongful act, which for convenience I call causative insanity. I have devoted this much space to the demonstration of a simple proposition because I fear there are many psychiatrists and some lawyers and judges who think any condition psychiatrists call mental illness, even a slight deviation from the normal, should excuse crime even though it did not cause it.

I have heard it said that psychiatrists do not like and do not use the word "insanity," but prefer to use the term "mental disease" which covers the whole gamut from a point just below the normal to psychosis or insanity. But our statute contains only the word "insanity," and we must deal with that term whether psychiatry uses it or not.

I suggest that difficulty will be avoided if the inquiry is confined to what I have called "causative insanity." Under that concept, any mental disease or defect which causes a crime is statutory insanity; and, conversely, any mental malady—no matter how serious or severe—which did not cause the crime is not statutory insanity.

The controversial Durham case [14] holds that the right-wrong and "irresistible impulse" tests are inadequate as exclusive criteria of insanity and concludes that a broader test should be adopted. The opinion then says, 94 U.S.App.D.C. at pages 240–241, 214 F.2d 862, 874: "In the District of Columbia, the formulation of tests of criminal responsibility is entrusted to the courts * * *" and lays down a so-called new rule that "is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect." [15]

I suggest that the "new rule" is nothing more than a different and confusing

14. Durham v. United States was decided by a division of this court of which I was not a member. I consider it confusing, to say the least, and think it should be overruled. The so-called Durham rule has been urged upon and rejected by a dozen or more states, three federal circuits, and the United States Court of Military Appeals. As far as I know it has been adopted by none, and prevails nowhere except in this jurisdiction and in New Hampshire, from which it was borrowed by this court.

15. This may be, and I think often is, confusing to a jury. It implies that a

way of saying that insanity does not relieve a defendant of criminal responsibility, unless it caused the unlawful act. It does not provide any new criterion for determining causation.

The right-wrong and "irresistible impulse" tests are criteria of causative insanity, that is, not only of insanity, but of causation as well. They are indeed the only true tests of causation. As I have heretofore suggested, it seems to me that one who knows right from wrong, but freely and deliberately chooses to do the wrong, cannot be heard to say that some mental disease or defect caused his criminal conduct. This is true even if the defendant's mentality actually deviates from the normal to the extent that psychiatrists say he has a mental disease or even insanity itself, so long as there is no causation.

So, I say the right-wrong and "irresistible impulse" tests remain the only criteria of causative insanity, and that the Durham case really added no new standard for the determination of causation.

6. Blocker did not file in support of his motion for a new trial the affidavit of any psychiatrist that he would testify concerning what the majority call "new medical evidence," nor did he account for the absence of such an affidavit. That is to say, the appellant did not file the affidavit of any psychiatrist that he would say on the stand that Blocker had a sociopathic personality disturbance which caused him to kill his wife, whether or not such a disturbance is a "mental disease." That being true, he did not make a showing which entitled him to a new trial. United States v. Marachowsky, 213 F.2d 235, 238 (7 Cir., 1954), certiorari denied 348 U.S. 826, 75 S.Ct. 43, 99 L.Ed. 651; United States v. Johnson, 142 F.2d 588 (7 Cir., 1944); Papineau v. Idaho First Nat'l Bank, 74 Idaho 145, 258 P.2d 755, 758 (1953); In re Missouri-Kansas Pipe Line Co., 23 Del.Ch. 215, 2 A.2d 273, 278 (1938); Huey v.

West Ossipee Mine, 81 N.H. 103, 122 A. 334 (1923); State v. Klasner, 19 N.M. 474, 145 P. 679, 683–684 (1914).

For these reasons, I dissent from the action of the majority in reversing and remanding for a new trial.

"mental disease" which, according to psychiatrists, may be something less than insanity and indeed may be merely a notch below the normal, may "produce" a crime. This is contrary to the statute. The Durham decision leaves the right-wrong and "irresistible impulse" tests as the only standards of causation.