Curtis **HIGHTOWER**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 17376.

United States Court of Appeals
District of Columbia Circuit.

Argued March 14, 1963.

Decided Oct. 22, 1963.

Petition for Rehearing En Banc
Denied Jan. 10, 1964.

Mr. Mark B. Sandground (appointed by this court), Washington, D. C., and Mr. Fred W. Danforth, Jr., of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, Buffalo, N. Y., for appellant.

Mr. Robert A. Levetown, Asst. U. S. Atty., at the time of argument, with whom Messrs. David C. Acheson, U. S. Atty., Frank Q. Nebeker, Asst. U. S. Atty., and Arthur J. McLaughlin, Asst. U. S. Atty., at the time the brief was filed, were on the brief, for appellee.

Before FAHY, WASHINGTON and DANAHER, Circuit Judges.

PER CURIAM.

Appellant, on March 3, 1962, attempted to steal five suits from a local department store. When apprehended by a store detective, appellant resisted arrest and assaulted the detective. Before trial, upon appellant's motion a mental examination was ordered. After the appellant had been certified as competent, a jury trial was waived. A District Judge upon all the evidence found the appellant guilty of larceny and assault. The facts as to criminal conduct are not in dispute so that upon appeal, appellant's principal claim is that he was entitled to an acquittal by reason of insanity.

At the trial the defense called Dr. Dorothy S. Dobbs who some time after May 1, 1962, in question and answer con-

versation on three occasions, had examined the appellant during the pre-trial period at St. Elizabeths where she was a staff psychiatrist. She saw him once at a staff conference. Dr. Dobbs testified that appellant had "an emotionally unstable personality" which she classified as a "mental illness, or mental disease." She had approved and signed a hospital report in which a resident psychiatrist found "There was no evidence of abnormal contents. His attention, perception, comprehension, seems adequate."

Other reports considered by the witness had used in describing the appellant such terms as "clever, scheming, ornery," she recalled. Appellant had discussed with her his drug addiction which she said stemmed from "extreme anxiety, tension, feelings of inadequacy, particularly around other people, and of depression." Such feelings, Dr. Dobbs explained, "are partially relieved by heroin." She deduced that there was a chain of circumstances between the "feelings" of the appellant which were partially relieved by drugs, and the drug addiction, and thence "to the obvious and well-known constant need for money to support his drug addiction, and from that to the stealing." She added on cross examination: "If, however, the stealing is unrelated to his drug addiction, then I can't see any relationship between the illness and the stealing."

Dr. Dobbs testified that appellant, when he stole the suits, knew he was doing wrong. She *assumed* "that the stealing was to provide himself with money in order to purchase drugs for his own use." The record discloses no evidence that on March 3, 1962, the appellant was without funds, or that the appellant had committed the crime in order to obtain funds to satisfy a craving for drugs.

Dr. Dobbs explained that the hospital staff was unable to say whether or not the offenses were a product of his mental disease. She testified that the staff had "no valid opinion" on this subject, an expression utilized in cases where there is a relationship, but "not necessarily a direct one" between the mental condition and the offense.

Queried by the judge as to the incidence of emotional instability among the general population, the witness noted that "all of us at times react with excitability or inappropriateness or mani- fest poor judgment. I think it is a matter of degree when we call it a mental disease. * * * [A]t times we have difficulty in drawing this line readily."

The defense next called Dr. Hamman, a psychiatrist who saw the appellant at St. Elizabeths on July 30, 1962. It was his opinion that the appellant for quite some time had been suffering from a personality disorder of severe proportions. He deemed drug addiction a symptom of a mental disease. He interpreted the hospital reports as showing "that there was no abnormal thinking present. In other words, the man was not suffering from a psychotic condition." He testified that from his conversation with the appellant the latter "has felt inadequate. He has felt uncomfortable around people. He has felt unable to partake of social intercourse. These are predominantly features of the schizoid personality. When he was able to obtain narcotics he felt more comfortable, more comfortable with people, increased his self-esteem. He was able to feel more normal."

Further on cross-examination, the witness said "The average person in the street would describe him as a mean, ornery, unlikable sort of fellow, or if they met him at another time, they might describe him as a nice guy. This is evidence of the mood swings which this man has shown."

Dr. Hamman believed "that a person who is, in fact, addicted to drugs is most likely suffering from a mental disease." Asked if the appellant would steal in the presence of a police officer, he answered "I would doubt it. I would think that he would go to a place where there was no police officer present. * * * I think control would be very limited. I think that he would—I don't think a person who is sick is necessarily stupid and I think that he would, if he saw a police-

man present, he would immediately dispatch himself to another location."

In colloquy with Dr. Hamman the judge pointed to Dr. Dobbs' statement "that everybody had an unstable personality. It is a matter of degree and we don't know just where the degree goes into mental disease or where it doesn't, is that right or isn't it?"

Dr. Hamman replied: "Well, I think I'd put it this way: I think one of the best definitions of a normal person, I read, is one who is not too neurotic.

"I think it depends on how one handles himself, how one handles his conflicts. Essentially, I agree with it."

The judge: "Does a normal person ever commit a crime, completely normal person?"

Dr. Hamman replied: "I suppose so. I guess it would depend on the type of crime. I can see a reasonably normal person—I can see where a normal person would commit a crime, but then, of course, they may be driven by some passion which may not necessarily be an excuse."

The trial judge commented as the trial concluded, "[I]f I had known that the testimony was going to be this weak, I wouldn't have permitted waiver of a jury trial and I would have instructed the jury on insanity. I have got an idea the jury would have been in in ten minutes with a verdict of guilty * * *."

The judge then continued the case that another expert psychiatrist, Dr. Marland, chosen by the Government, might examine the appellant and thereafter further advise the court. When informed by the doctor that the court had requested the examination, the appellant refused to cooperate, the expert testified. In Dr. Marland's opinion, a person suffering from an emotionally unstable personality is not suffering from a mental disease, nor is drug addiction a mental disease.[1]

Our compendious summary of the sort of testimony which the trier was free to accept is presented simply to illustrate the record before us. There was no testimony that this appellant on March 3, 1962 was without funds or that he was stealing to get money to buy drugs or that he was then an addict or even that he was in a state of remission if he earlier had been an addict.

There is no factual evidence in this case—as distinguished from conclusory opinion—that appellant's drug addiction caused him to commit the theft and the assault here involved. The record shows nothing about how recently he had taken drugs[2]; how great a craving, if any, he was then suffering; whether he had a supply of drugs; or specifically, whether his need for drugs directly produced this particular theft and assault. Both psychiatrists called by the appellant agreed that the appellant's "emotionally unstable personality" was a factor only insofar as it explained drug addiction. A trier of fact could perhaps *assume* some of the foregoing things without any specific proof—as evidently the psychiatrists did in evaluating the appellant's general condition.[3] But the trier

---

1. We do not, of course, pass on the correctness of these views, or those of the other witnesses, as we are not required to do so to reach a decision in the present case. As to proposals for the "treatment" of drug addicts and methods, past and current, for their "punishment," see concurring opinion of Mr. Justice Douglas in Robinson v. California, 370 U.S. 660, 668 et seq., 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

2. There is evidence that the defendant was under observation at D. C. General Hospital from February 14–19, 1962; that he was released on February 19, about two weeks before committing the acts with

which he was charged; and that the General Hospital reported that he then suffered from drug addiction, not mentioning any mental disease. But we are not informed as to what, if anything, that report stated as to the degree of his addiction, or the frequency and severity of his need for drugs at that time. Presumably he was not provided with drugs while in the Hospital.

3. Both of the psychiatrists referred to a "chain of circumstances" as causing the stealing: a mental condition or illness leading to drug addiction, a need for money to support the addiction, and finally stealing to supply the money. Neither

of fact in this case was not bound to make any such assumptions, or to accept the general and conclusory assumptions of the psychiatrists as representing the actual facts in this case. The judge was thus not compelled as a matter of law to have a reasonable doubt as to the element of causation—i. e., whether the offense was the "product" of a mental disease, within the meaning of the *Durham* rule.[4]

Thus it was the judge announced that he found no evidence that the appellant was suffering from a mental disease at the time of the alleged acts, or that there was a mental disease of which the appellant's conduct was the product.

We have recently made it clear that a jury is not ordinarily required to accept the opinion of psychiatrists as to whether one was suffering from a mental illness at the time of the offense and as to whether the act was the product of or was caused by a mental illness.[5] Similarly, a trial judge sitting in lieu of a jury is not required to accept expert opinion on such matters. There must be a serious mental disease, and satisfactory evidence of causation, before a verdict of acquittal by reason of insanity must follow as a matter of law.[6] For the reasons given, this is clearly not such a case.[7]

As to the problem whether reversible error was committed, requiring a new trial, it is clear that a judge sitting without a jury must be reversed if he shows a fundamental misunderstanding of the evidence or of the governing law. Cf. J. D. Hedin Construction Co. v. F. S. Bowen Electric Co., 106 U.S.App. D.C. 386, 388, 273 F.2d 511, 513 (1960), and cases cited. But we do not think that this occurred here. True, the judge said that he could not find "on the evidence before the court that this defendant was suffering from a mental disease at the time of the alleged acts, or that there was any mental disease that the crime was a product of * * *." In effect he said that as trier of the facts he found that the defendant was not suffering from a mental disease at the time of the alleged acts and that there was no mental disease that produced the crime. There is no justification for an assumption that he had a reasonable doubt as to either point. We do not know that the judge's view of the law or of his duties as trier was in any way erroneous, and we have indicated why we think an assumption that he did not understand the matter is unwarranted. Further, the presumption is that he did know the proper standard to apply, and applied it. To reverse the judge's decision as a trier of fact on a ground such as

psychiatrists testified to any facts elicited from the defendant or obtained in some other way to support a conclusion that, with respect to the conduct involved here, the defendant needed money and that he stole to obtain it. Neither testified that the assault on the officer was caused by mental disease. One psychiatrist stated indeed that her chain included "an assumption that the stealing was to provide himself with money in order to purchase drugs for his own use," but—as we have already pointed out—added that if "the stealing is unrelated to his drug addiction, then I can't see any relationship between the illness and the stealing."

4. He could, no doubt, have acquitted appellant on the ground of insanity. But he was not bound to do so. The appellant did not testify so that the record contains no explanation from him.

5. Campbell v. United States, 113 U.S.App. D.C. 260, 307 F.2d 597 (1962); Carey v. United States, 111 U.S.App.D.C. 300, 296 F.2d 422 (1961); McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962).

6. Campbell v. United States and McDonald v. United States, *supra* note 5; cf. Blocker v. United States, 107 U.S.App.D.C. 63, 64, 274 F.2d 572, 573 (*en banc* 1959).

7. In Campbell v. United States, *supra* note 5, the alleged illness was "emotionally unstable personality," and the expert evidence for the defense—offered by Dr. Dobbs and Dr. Owens for St. Elizabeths Hospital—was strikingly similar to that offered in this case, though without mention of, or reliance on, drug addiction. We held that a motion for a directed verdict was properly denied, and that the issue was one for the jury.

this, absent any real indication that he applied the wrong standard and absent an objection or request for clarification, would not, we think, be justified. Compare Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224 (1937).

Affirmed.

FAHY, Circuit Judge (dissenting).

Appellant, the defendant, at material times was a drug addict. However, the case does not involve any violation by him of the narcotic laws. He was indicted and convicted of stealing clothes from a department store, and of simple assault in scuffling with a store employee when accosted. After pleading not guilty he was committed to St. Elizabeths Hospital for examination to determine whether he was competent to stand trial and whether he was suffering from mental disease or defect at the time of the theft, and, if so, whether the conduct charged to him was caused by such disease or defect. Defendant was subsequently certified as competent to stand trial.[1] Having waived trial by jury he was tried by a district judge. The sole defense was insanity.

Defendant did not testify and so no conclusion as to his mental condition could be drawn from his demeanor at the trial. Two psychiatrists on the staff of St. Elizabeths who had examined him while he was at the Hospital testified that he was suffering from a mental disease at the time of the offenses, and that the offenses were the product of the disease.

They said he knew that what he did was wrong but that this did not affect their opinion. It is now well settled that knowledge of the difference between right and wrong, though relevant to the issue, is not the ultimate test of criminal responsibility in this jurisdiction.

A summary of the evidence of the psychiatrists, who went into details, is now given. Defendant was subject to an overwhelming craving for drugs which seriously impaired control of his actions.[2] The mental disease from which the doctors said he suffered was described as a personality disorder of severe proportions. They said his mental condition led him to use drugs, and he stole to obtain narcotics for this addiction; that his addiction was a symptom of the disease and his actions were caused by his almost irresistible need to obtain narcotics. In other words his capacity to control his action was impaired by both the illness and the drug addiction. Other characteristics of the accused which indicated his mental disease were also explained. One of the psychiatrists said defendant had an emotionally unstable personality evidenced by his history, and that his condition also showed features of schizoid personality; that he displayed two personalities while in St. Elizabeths, one of cooperation and the other quite out of proportion, leading to his transfer to a more secluded ward. One of the doctors testified that "until something is done about him, until he can do something about himself, he is

---

1. The letter from St. Elizabeths noted the presence of a mental disease then and at times pertinent in the past, though it said no "valid opinion" as to whether the acts charged were the product of this mental disease could be formed.

2. That he was a drug addict at the time of the offenses seems quite clear. One of the doctors was asked whether or not he was familiar with the alleged offense. He responded affirmatively, and was then asked if the offense was caused by the defendant's mental condition. The doctor responded:
"A. Well, in that the mental condition led to his using addicting drugs and in that he

was stealing in order to get ahold of addicting drugs. I would say there was a causal connection.
"Q. Did you ascertain how long he had been using narcotics or dope? A. Well, of course, I have only his own word on this. He stated since the age of 14. I have no reason to disbelieve this. There certainly is indication that he had been addicted for a number of years.
"Q. [And how old is he now?] A. [T]wenty-six."
Moreover, the report of the District of Columbia General Hospital stated he was suffering from addiction. The Government did not dispute that defendant was a drug addict.

going to continue to take dope and he is going to continue to steal to get the money to take it." [3]

With no evidence whatever to dispute the testimony that defendant suffered from a diseased mental condition and that this condition was causally related to the conduct for which he was criminally charged, the case was submitted to the judge for decision. The judge expressed concern as to the state of the evidence, whereupon the Government suggested a continuance to seek a private psychiatrist. The case was continued from September 4 to September 14, 1962. On the latter date a doctor called by the Government as an expert testified that during the recess he had seen defendant once and the latter refused to cooperate. The prosecuting attorney asked no further questions, thus abandoning any effort to offset the evidence of the doctors who had previously testified. The court then asked the doctor, "[W]hat is an emotionally unstable personality?" He replied that he supposed it is "an individual who is unable to control outbursts of emotion or, perhaps, one who is not necessarily unable but who has extremes of emotional tension from time to time, loses his temper, weeps or shows other evidence of emotion." [4] Asked by the court if he considered a person suffering from an emotionally unstable personality as suffering from a mental disease,

he replied that he did not; but, of course, this is not a statement that such a person is not also suffering from a mental disease. On cross-examination he said he was not aware that other experts had testified that defendant was not mentally sound at the time of the offenses, and that such an awareness would not change his opinion, but, he added, he did not have enough facts to express an opinion as to the defendant's mental condition at the time of the offenses.

Clearly, as it seems to me, the Government did not seriously seek to prove, much less actually prove beyond a reasonable doubt, as required to sustain the indictment, that defendant was not suffering from a mental disease at the time of the alleged offenses or that his conduct was not the product of such disease. I do not say that because a person is a drug addict he is for that reason suffering from a mental disease which relieves him of criminal responsibility for acts attributable to the addiction. Each case must be judged on the evidence in that case. The only evidence worthy of consideration as to this defendant's condition was that he was in fact suffering from a mental disease which caused the conduct for which he was indicted. For this reason I think there arose as matter of fact and law a reasonable doubt as to his criminal responsibility for the offenses, and the

3. The majority makes reference to a report rendered by a doctor at St. Elizabeths to the effect that the defendant's attention, perception and comprehension seemed adequate. The meaning of this report was explained by one of the defense psychiatrists in the following terms: "By that he was stating that there was no abnormal thinking present. In other words, the man was not suffering from a psychotic condition. Content of thought refers to whether or not the person sees the world realistically or whether he has delusional ideas."

From this explanation it can be seen that the report in question referred to only one of the mental factors which must be considered in determining whether the defendant was suffering from a mental disease and in no way represented a conclusive diagnosis that the defend-

ant was sane. The evidence also shows that this report was considered by the witnesses who testified for the defense in the formation of their opinions as to the defendant's condition. Moreover the doctor who made the report had not completed his three years of residency training, being in his first year of such training at the time. The Government did not call this doctor as a witness so that he could be subject to examination and cross-examination and we do not know his ultimate opinion regarding defendant.

4. This definition, it will be noted, was not applied by the witness to defendant's condition and does not dispute the express testimony of the defense doctors that defendant's mental condition substantially impaired his behavioral control.

court should have found him not guilty by reason of insanity, with the result that he would have been sent to St. Elizabeths Hospital for treatment and there retained until no longer dangerous to himself or the community.

I recognize that the question of criminal responsibility is an ultimate one for the trier of fact, and

> whether uncontradicted evidence, including expert opinion evidence, which is sufficient to raise a jury question on the mental issue is also sufficient to require a directed verdict depends upon its weight and credibility. Douglas v. United States, 99 U.S.App.D.C. 232, 239 F.2d 52.

McDonald v. United States, 114 U.S.App. D.C. 120, 312 F.2d 847, 850 (1962); but the expert opinion evidence in this case was entitled to special weight, for it did not stand alone; it was related to a definite and long addiction of defendant to drugs, a condition which itself affects the mind and control of conduct. Moreover, there was not lacking a conclusive diagnostic opinion that the offenses were the product of the mental disease, as there was in Campbell v. United States, 113 U.S.App.D.C. 260, 307 F.2d 597 (1962); nor was there introduced by the Government any reliable psychiatric testimony rebutting the defense of insanity, as there was in Carey v. United States, 111 U.S.App.D.C. 300, 296 F.2d 422 (1961). Furthermore, it is obvious that sufficient doubt was generated by the defense evidence to cause the judge to continue the case to enable the Government to meet this evidence. This it failed to do.[5]

The majority says there is no factual evidence, as distinguished from a conclusory opinion, that the drug addiction caused defendant to commit the theft and assault, that the record shows nothing about how recently he had taken drugs, how great a craving if any he was suffering, whether he had a supply of drugs, or that a need therefor directly produced this theft and assault. The opinion then states, in support of the trial judge's conclusion, that the judge was not bound to assume that such facts as the above existed, or to accept the general and conclusory assumptions of the psychiatrists as representing the actual facts in the case. In the first place, the majority ignores Dr. Hamman's testimony that defendant had the "compulsive need—the almost irresistible need to obtain narcotics" and to obtain money to get narcotics. In the second place, and more importantly, the court here adopts a standard which places upon the defendant the burden of proving such facts as are said not to have been proved. But the burden was upon the Government to prove beyond a reasonable doubt either that defendant was not suffering from a mental disease or that the forbidden conduct was not the product of a mental disease. The trier of the facts must decide the issue on the basis of all relevant and material evidence introduced, but there is no requirement that the evidence which creates a reasonable doubt include proof of such facts as the majority states were not proved. Ample evidence was introduced on the issue of mental disease and causality.

In order to point up the mistake in the approach of the majority, as it seems to me, let us consider the problem in the context of a case where the defense of insanity is successful. In any such case there is never proof of the "fact," in the sense in which the majority uses that word, that a mental disease was responsible for the commission of the act. It is always a matter of opinion. And even if the majority's erroneous standard of proof is applied to the conclusion reached by the judge in this case, which the majority accepts, it cannot be said that the Government proved beyond a reasonable doubt as a "fact," in the sense the majority uses the word, that the defendant was not suffering from a

---

5. We need not decide whether we should reverse had the unanimous verdict of a jury found defendant to be guilty.

mental disease or, if he was, that the disease was so unrelated to the offenses as not to relieve defendant of responsibility. Rather, the judge reached a factual conclusion, or formed an opinion. So did the doctors; and their opinions, while not binding as such on the judge, when coupled with the other evidence created the reasonable doubt which the judge himself apparently held when he recessed the trial. The expert called by the Government after the recess certainly did not afford a basis for abandonment of the doubt. In any event, the testimony as a whole leads me to the conclusion I have reached.

There is another and independent reason for reversal, though this reason would authorize a new trial rather than require an acquittal on the ground of insanity. In finding defendant guilty the judge said, "I cannot find on the evidence before the Court that this defendant was suffering from a mental disease at the time of the alleged acts, or that there was any mental disease that the crime was the product of * * *" This is not the correct standard, which is that the trier of the facts must be convinced beyond a reasonable doubt that the accused had no mental disease of which the crime was the product:

> The burden is upon the Government to establish beyond a reasonable doubt * * * either (1) that the accused had no mental disease or defect or (2) that, although the accused was defective or diseased, his act was not the product of the affliction. Or, to state the matter otherwise, the jury must acquit unless it is convinced beyond a reasonable doubt that the alleged criminal act was not the product of a mental disease or defect.

Carter v. United States, 102 U.S.App. D.C. 227, 234, 252 F.2d 608, 615 (1957). And see Lynch v. Overholser, 369 U.S. 705, 713, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962).

While it may be that in his own mind the judge followed the correct standard we cannot presume that he did so when the record affirmatively indicates the contrary. In any event the verdict of guilty should not be affirmed so long as the record indicates an incorrect legal standard was applied in resolving the most important issue in the case.