Herbert T. O'BEIRNE, Petitioner,

v.

Winfred OVERHOLSER, Respondent.

No. 50–61.

United States District Court
District of Columbia.
April 27, 1961.

See also 180 F.Supp. 572.

654

Alan Kay, Arlington, Va., for petitioner.

Oliver Gasch, U. S. Atty., and Oscar Altshuler, Asst. U. S. Atty., Washington, D. C., for respondent.

HOLTZOFF, District Judge.

This is a writ of habeas corpus issued on the application of an inmate of Saint Elizabeths Mental Hospital, claiming that he is unlawfully restrained of his liberty.

On October 18, 1957 the petitioner, Herbert T. O'Beirne, was tried in the Municipal Court for the District of Columbia, on a charge of petit larceny. In case of conviction, the maximum sentence of imprisonment that could have been imposed on him was for a term of one year. His counsel, however, interjected the issue of insanity. The petitioner was found not guilty by reason of insanity and was thereupon committed to Saint Elizabeths Hospital, where he has remained ever since—about three and one-half years.

This commitment was made pursuant to D.C.Code, § 24–301(c) and (d), which read as follows:

"(c) When any person tried upon an indictment or information for an offense, * * * is acquitted solely on the ground that he was insane at the time of its commission, that fact shall be set forth by the jury in their verdict.

"(d) If any person tried upon an indictment or information for an offense, * * * is acquitted solely on the ground that he was insane at the time of its commission, the court *shall* order such person to be confined in a hospital for the mentally ill." (Emphasis supplied.)

The procedure for the release of a person committed under the foregoing provisions is prescribed in subsection (e), the pertinent parts of which read as follows:

"(e) Where any person has been confined in a hospital for the mentally ill pursuant to subsection (d) of this section, and the superintendent of such hospital certifies (1) that such person has recovered his sanity, (2) that, in the opinion of the superintendent, such person will not in the reasonable future be dangerous to himself or others, and (3) in the opinion of the superintendent, the person is entitled to his unconditional release from the hospital, * * * such certificate shall be sufficient to authorize the court to order the unconditional release of the person so confined from further hospitalization at the expiration of fifteen days from the time said certificate was filed and served as above; but the court in its discretion may, or upon objection of the United States or the District of Columbia shall, after due notice, hold a hearing at which evidence as to the mental condition of the person so confined may be submitted, * *. The court shall weigh the evidence and, if the court finds that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others, the court shall order such person unconditionally released from further

confinement in said hospital. If the court does not so find, the court shall order such person returned to said hospital * * *."

In other words, a person who has been acquitted of a crime on the ground of insanity and has been committed to a mental hospital, may be unconditionally released only on the basis of a certificate of the superintendent of the hospital to the effect that he has recovered his sanity and that in the opinion of the superintendent he will not in the reasonable future be dangerous to himself or others, and is entitled to his unconditional release. Necessarily the requirement of a certificate that the person will not in the reasonable future be dangerous to himself or others, means dangerous by reason of mental disease or defect, and not merely because of any propensity to commit crimes—or any other cause. The certificate is a condition precedent to a discharge.

 The petitioner contends that the superintendent is arbitrarily and capriciously withholding such a certificate. The return to the writ denies that the superintendent is arbitrary and capricious, and affirmatively avers that the petitioner "has not recovered from his abnormal mental condition and requires further treatment before he can be certified as not dangerous to himself or others if released into the community". The assertions of the return are general in form. There is no specification or explanation as to what the "abnormal mental condition" is in this instance. This phrase is not a word of art and may comprize many conditions that do not constitute either a mental illness or a mental defect. There is no allegation that the petitioner is suffering from any mental illness or mental defect, or any specific diagnosis. To use the words of the statute, there is no allegation that he has not recovered his sanity. The return is manifestly insufficient on its face. Moreover, there is no statement as to what treatment the petitioner needs, or what treatment is contemplated for him, or in fact what treatment he has received in the past.

 At the outset the scope of judicial review in this matter must be defined. As shown above, the statute exacts an appropriate certificate of the superintendent of the hospital as a condition precedent to release. The court may not substitute its own judgment for that of the superintendent and may not try the matter *de novo*. On the other hand, the action of the superintendent, or his failure to act, may not be deemed final or conclusive for all purposes.[1] Otherwise a person could be restrained of his liberty indefinitely at the fiat of an administrative officer. Such a course would be contrary to the basic principles of American free institutions. No executive or administrative official may deprive any one of his freedom without judicial review.[2] This court may step

1. Cf. Lord Acton's well-known observation that "power tends to corrupt and absolute power corrupts absolutely."

2. It is sometimes said, even by persons in authority, that judicial supervision over commitments to mental hospitals is unnecessary because no one is ever "railroaded" to, or erroneously detained in a public mental institution. This statement is inaccurate, and actually judicial safeguards, if anything, need to be increased rather than relaxed.

An outstanding example is the tragic story of John J. Egan, a first lieutenant in the Marine Corps. The facts are narrated in detail in the opinion of the Court of Claims in Egan v. United States, 158 F.Supp. 377. Briefly summarized they are as follows. While serving overseas in Samoa, Lieutenant Egan on February 12, 1943, entered a field hospital for treatment for bronchitis. During his stay at the hospital, he reported that another patient in the plaintiff's ward had attacked a physician and that he, Egan, had intervened and disarmed the patient. Although later the truth of this assertion was established, the investigating officers were unable to secure corroboration of his story. The hospital authorities assumed that he had been suffering from a delusion, diagnosed him as insane, and on February 17, 1943, confined him to the locked ward of the hospital. His protests were regarded as additional symptoms of

in to determine whether the action or failure to act, on the part of the superintendent, is arbitrary and capricious. In fact the Congress contemplated this contingency, as is evidenced by subsection (g) of the above statute:

"(g) Nothing herein contained shall preclude a person confined under the authority of this section from establishing his eligibility for release under the provisions of this section by a writ of habeas corpus."

It may well be that this provision is surplusage, but the Congress wisely included it as a matter of precaution.

 The words "arbitrary and capricious" are a technical legal phrase. They are not used in their popular sense and in this connection have no oppro-

brious connotation. In the eyes of the law an administrative action not supported by evidence or lacking a rational basis, is deemed arbitrary and capricious. Decisions of administrative officers may not be predicated on their personal desires or views, no matter how sincere they may be, O'Boyle v. Coe, D.C., 155 F.Supp. 581, 584.

The principles are but an application of the scheme of the Administrative Procedure Act, the pertinent provisions of which are as follows (5 U.S.C.A. § 1009):

"Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion.

"(a) Any person suffering legal wrong because of any agency ac-

---

insanity. On March 15, 1943 he was transferred from the locked ward of the Naval Hospital in Samoa to the locked ward of a naval vessel and transported to the United States. On March 28, 1943 he was taken to the locked ward of the United States Naval Hospital on Mare Island, California. On May 28, he was released and ordered to proceed to the Naval Medical Center at Bethesda, Maryland. On his arrival in Bethesda, on June 7, 1943, he was placed in a locked ward, and on June 17, 1943 was transferred to Saint Elizabeths Hospital. He remained in Saint Elizabeths Hospital until October 30, 1943, when he was released. He secured his release by escaping from the hospital, causing himself to be examined by private physicians, and returning to the hospital with the reports of those physicians, and then threatening the hospital authorities that he would apply for a writ of habeas corpus. During his stay at Saint Elizabeths Hospital a Naval Medical Board convened and recommended his discharge from the Marine Corps on the ground of mental illness, in spite of the fact that they had an opportunity to interview him. The Board had before it the record of another officer by the same name, although necessarily with a different serial number, who had been diagnosed as mentally ill, and erroneously used that record. The Court of Claims made the following interesting comments (158 F.Supp. at page 380):

"During the five months of plaintiff's confinements in locked wards as an insane person, he attempted in every conceivable way to persuade the medical officers that

he was not insane. His growing sense of frustration and his occasionally vehement protests only served to confirm the medical authorities in their opinion that plaintiff was insane. Throughout plaintiff's confinements no technical tests administered to him by doctors resulted in the manifestation of any symptom of a psychiatric origin, or of any physical condition of a psychogenic origin."

The plaintiff, after his discharge from the hospital obtained civilian Government employment. He continued energetic efforts to vindicate his position and finally in 1948, the Board for the Correction of Naval Records, after investigating the matter, concluded that Egan had never been insane and that all the diagnoses to the contrary had been negligently made and were erroneous, and ordered the cancellation of the illegal discharge and the issuance of a new honorable discharge. This decision was approved by the Secretary of the Navy on March 17, 1948.

In the meantime, Egan's military career had been ruined and he undoubtedly had suffered untold mental torture which left a profound impress on his life. The Court of Claims awarded to him the pay that he had lost by reason of being wrongfully deprived of his promotion to a captaincy, less his earnings in civilian employment. This was but paltry recompense for his untold suffering and his irretrievable ruin. No doubt this is an extremely rare and extraordinary case, but judicial safeguards are needed and intended to prevent miscarriage of justice in exceptional instances.

tion, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof.

"(b) The form of proceeding for judicial review shall be any special statutory review proceeding relevant to the subject matter in any court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action (including actions for declaratory judgments or writs of prohibitory or mandatory injunction or *habeas corpus*) in any court of competent jurisdiction."

The Court of Appeals has approved the application of this doctrine to such matters as that involved in the instant case, and has ruled that this court may review the question whether the refusal of the superintendent to issue the statutory certificate is arbitrary and capricious, also holding that the burden of proof on this issue is on the petitioner, Overholser v. Leach, 103 U.S.App.D.C. 289, 291, 257 F.2d 667; Overholser v. Russell, 108 U.S.App.D.C. 400, 283 F.2d 195, 197; Ragsdale v. Overholser, 108 U.S. App.D.C. 308, 281 F.2d 943, 946.

■ In Overholser v. Leach, supra, the Court of Appeals in the concluding sentence of its opinion, states that in order that the inmate may be rendered eligible for release "there must be freedom from such abnormal mental condition as would make the individual dangerous to himself or the community in the reasonably foreseeable future." 103 U.S.App.D.C. at page 292, 257 F.2d at page 670. Obviously, the words "abnormal mental condition" must be read and understood in their context. They necessarily refer to a mental disease or mental defect, and not just any condition that is outside of the ordinary norm.

A determination of the question whether in this instance the refusal of the superintendent of Saint Elizabeths Hospital to submit the statutory certificate was arbitrary and capricious, necessitates a somewhat detailed review of the facts and the evidence. On December 29, 1956 the petitioner was brought before the Municipal Court on a charge of petit larceny, specifically that he stole three watches and two rings, valued in the aggregate at less than $100. He pleaded guilty and was sentenced to imprisonment for one year. Shortly thereafter, however, his counsel made a motion to vacate the judgment and for leave to withdraw the plea of guilty. This motion was granted on January 27, 1957. The judgment was vacated and the plea of guilty was withdrawn. A mental examination was then ordered at the District of Columbia General Hospital.

On February 19, 1957 the Chief Psychiatrist of the hospital formally reported the defendant to be psychotic, incompetent, and incapable of participating in his own defense, and recommended that he be committed to a hospital. Accordingly, the petitioner was eventually committed to Saint Elizabeths Hospital. On August 7, 1957, Dr. Addison M. Duval, Acting Superintendent of Saint Elizabeths Hospital, formally reported in writing to the Clerk of the Municipal Court that O'Beirne was at that time mentally competent to stand trial. The petitioner was then transferred to the District of Columbia jail. By letter of September 17, 1957 written to the petitioner's counsel, the Chief Psychiatrist of the District of Columbia General Hospital stated that the petitioner had been in the hospital from January 29, 1957 to April 17, 1957, and was diagnosed as suffering from a chronic brain syndrome; that this condition must have existed for at least two or more months prior to his admission; and, that, therefore, the crime committed sometime in the month of December was the product of the mental disease.

Dr. Addison M. Duval, the Acting Superintendent of Saint Elizabeths Hospital supplemented his formal report to the court dated August 7, 1957, by a letter of October 11, 1957, to the peti-

tioner's counsel, in which he stated that, "during his residence in Saint Elizabeths Hospital from April 17, 1957 to August 29, 1957, Mr. O'Beirne did not manifest symptoms of mental illness, and he was discharged from Saint Elizabeths Hospital, August 29, 1957 into the custody of the United States Marshal as 'without mental disorder' and competent."

Reading together the letters from the District of Columbia General Hospital and Saint Elizabeths Hospital, it is a reasonable inference that during his stay at the District of Columbia General Hospital and for two or more months previously the petitioner suffered from a temporary mental illness from which he had recovered by the time he reached Saint Elizabeths Hospital, since he manifested no symptoms of mental disease in the latter institution and was discharged therefrom as being "without mental disorder".

On October 18, 1957, the case again came before the Municipal Court for trial. The defendant pleaded not guilty and on the basis of the report of the District of Columbia General Hospital, to which reference has been made, he was found not guilty on the ground of insanity. Having no alternative in the matter, but being bound by the mandatory statutory provision, the Municipal Court forthwith committed the petitioner to Saint Elizabeths Hospital, even though the superintendent of the hospital had reported that he was without mental disorder. There is no suggestion on the part of the hospital staff that subsequently to his commitment of October 18, 1957, there has been any change for the worse in the petitioner's mental condition. On the contrary the present diagnosis is the same as that of August 1957. Yet the hospital authorities decline to certify him for release, in spite of the fact that they had previously discharged him as being without mental disorder.

The explanation for this anomalous situation is as follows as found in the evidence adduced at the hearing before this court. Both Dr. David J. Owens of the staff of Saint Elizabeths Hospital, and Dr. John R. Cavanagh, who had been appointed by the court on the application of petitioner's counsel, agreed that the defendant had a "sociopathic personality disturbance, antisocial personality" or "antisocial type". This condition was not accompanied by any psychosis or any other abnormal mental condition. It is a type of personality, rather than a mental state. It should be said in passing that the terms "sociopathic personality" and "sociopath" have been recently devised and are synonymous with what were formerly known as "a psychopathic personality" and "a psychopath". The terms last mentioned are probably more familiar to the layman than the new phraseology.

There has been and there still is a difference of opinion in the psychiatric profession as to whether a sociopathic personality is, or is not, a mental disease. Some psychiatrists take the affirmative view, while others adhere to the contrary opinion. For example, Dr. Owens believed it to be a mental disease, while it was Dr. Cavanagh's conviction that it was not an illness, but merely a type of personality that creates difficulties in adjustment. Dr. Cavanagh reported that the petitioner was free of any mental disease or mental defect.

The evidence shows that prior to November 18, 1957 it had been the "administrative policy" of Saint Elizabeths Hospital to diagnose sociopaths as being without mental disorder and not classify a sociopathic personality as a mental disease. On November 18, 1957, exactly one month after the petitioner was committed to Saint Elizabeths Hospital, the authorities of the hospital made a public pronouncement to the effect that it had changed its "administrative policy" and that, thereafter, it would regard a sociopathic personality as a mental disease. Dr. Owens candidly admitted that if the petitioner's case had been reached for final disposition by the hospital by November 17, 1957, he would have been discharged as being without mental disorder. No doubt the same result would have been attained if the

issuance of the public pronouncement had been delayed and O'Beirne's case had completed its progress through the hospital before that time.

That personal liberty should depend on such an arbitrary circumstance is manifestly intolerable and contrary to the basic principles of freedom.

Dr. Owens further explained that irrespective of what the official view of the hospital had been prior to November 18, 1957, or was subsequently to that date, different members of the hospital staff maintained their own personal opinions and differed on the matter, and still do. Thus, he testified (Tr. p. 92):

"If I may use the specific example, if Dr. Cushard had testified in this court, it would have not been a mental disease; if Dr. Cody had testified in this court, it would have been a mental disease."

That personal liberty should depend on whether Dr. A or Dr. B of the hospital staff appears as a witness on the return to a writ of *habeas corpus*, is almost inconceivable and obviously insufferable.

■ The uncontradicted evidence showed that a person with a sociopathic personality or a sociopath is not subject to commitment to a mental hospital in a civil proceeding, because for this purpose a sociopathic personality is not regarded as sufficient basis for an adjudication of mental incompetency. Both Dr. Owens and Dr. Cavanagh so testified. It seems astounding that a person who is not sufficiently ill mentally to be subject to a civil commitment to a mental institution can be confined in a locked criminal ward of a mental institution when he would not even be eligible for admission to the more desirable civil side of the hospital. In this case the petitioner has been incarcerated in a criminal ward of a mental hospital for over three years

because he committed a crime for which he could be punished by imprisonment for not more than one year, and this has occurred under circumstances under which he could not be committed as a civil patient because he is not insane.

■ It is a matter of common knowledge and was not disputed that many psychopaths or sociopaths, as they are now called by psychiatrists, pursue the even tenor of their way in society and regularly earn a livelihood, even though they may not rise to great heights. Some of them, to be sure, are occasional or habitual petty criminals. The fact, however, that a person is an habitual petty criminal should not subject him to permanent incarceration in a criminal ward of a mental institution. Such a disposition may not be used as a substitute for laws that deal expressly with habitual criminals. It is inhumane to confine sane human beings in a lunatic asylum.

In this case the petitioner has a record of having committed petty crimes in the past. It is not unlikely that, if liberated, he may repeat offenses of this type. These crimes cannot properly be said to be the product of a mental disease, if a sociopathic personality is not a mental disease. He cannot, therefore, logically be said to be dangerous to himself or others as a result of a mental disease, if in fact he has none.

■ It should be borne in mind that the petitioner has never been found to be insane or mentally incompetent. An acquittal of a criminal offense on the ground of insanity under the present practice is not an adjudication that the defendant was or is insane, but is merely a conclusion that the Government has failed to prove beyond a reasonable doubt that the defendant was mentally competent at the time of the commission of the crime of which he was accused.[3]

3. In United States v. Naples, D.C., 192 F.Supp. 23, this court held that in 1955 by enacting the provision for mandatory commitment of a defendant found not guilty on the ground of insanity, Congress intended to shift from the Government to the defendant the burden of proof on the issue of insanity. This view of the law has not as yet been put into practice.

He has never had a trial or a hearing on the question whether he is presently insane, and has never been accorded the privilege of jury trial on this issue.

The court is of the opinion that it was arbitrary and capricious for the superintendent of Saint Elizabeths Hospital to refuse to certify the petitioner for release merely because while the case was being processed through the hospital, the official attitude that a sociopathic personality is not a mental illness, was changed by the hospital staff and the contrary view is being applied to him. Such a retroactive application is unreasonable and unjust. The court repeats that the words, "arbitrary and capricious" are used not in a popular or opprobrious sense, but in a technical, legal significance. This court concludes that there is no rational basis for the action of the superintendent. The court has no doubt as to the sincerity of the able superintendent and his competent staff, but is of the opinion that they may not use their personal views in the manner in which they have done in this case to deprive the petitioner of his liberty. It must be emphasized that the case at bar drastically differs from cases in which sociopaths who were tried subsequently to November 18, 1957, and taking advantage of the change in the administrative policy of the hospital, were found not guilty on the ground of insanity. Such a person has no just cause for complaint.

As a practical matter a sociopathic personality, being, as its very name implies, a personality of a specific type, rather than a mental state, does not ordinarily change and is completely incurable, as the evidence shows. If it is to be deemed a mental disease or a mental defect, then a sociopath found not guilty of a crime on the ground of insanity, may be subjected to what amounts to practically life imprisonment in the criminal ward of a mental hospital, although he could not be committed to a mental institution in a civil proceeding. What is even worse, a sociopath who commits a petty offense might find himself incarcerated for life among madmen, instead of being subjected to a short term of imprisonment in jail. While, on the one hand, a plea of insanity should not be used as an escape route from punishment for crime, on the other hand, it should not be invoked by the Government as a means of permanently incarcerating petty offenders even if they are habitual criminals.

Some of the difficulties that have confronted the courts as a result of the use of the formula enunciated in the case of United States v. Durham, 94 U.S.App.D.C. 228, 214 F.2d 862, stem from this reversal of attitude on the part of the authorities of Saint Elizabeths Hospital. When that decision was handed down by the Court of Appeals, sociopaths were not treated or regarded as persons suffering from a mental disease or a mental defect and, therefore, on this basis alone could not be acquitted on the ground of insanity. It is reasonable to assume that the Court of Appeals did not contemplate that within a couple of years Saint Elizabeths Hospital would regard such persons as mentally diseased or mentally defective and thereby lay a basis for their acquittal on the ground of insanity and commitment as lunatics. It is not inconceivable that perhaps the so-called Durham formula would not have been adopted if it had been foreseen at the time that it would lead to the exculpation of sociopaths or psychopaths from criminal liability.

Able counsel for the Government relies on the decision of the Court of Appeals in Overholser v. Leach, 103 U.S.App.D.C. 289, 257 F.2d 667. That decision is distinguishable, however. It was during the Leach trial that the authorities of Saint Elizabeths Hospital made their pronouncement that from that moment on they would classify sociopathic personality as a mental disease. Leach re-

ceived the benefit of this *tour de force* and was acquitted on the ground of insanity—something that would not have happened if he had been tried a few days earlier. He was not in a position to complain when he found himself in a mental institution as a result of receiving what seemed to him at the time to be a benefit of the new outlook.

So, too, in Ragsdale v. Overholser, 108 U.S.App.D.C. 308, 281 F.2d 943, the defendant was tried subsequently to the adoption of the view by Saint Elizabeths Hospital that a sociopathic personality constituted a mental disease. Taking advantage of that attitude he secured an acquittal on the ground of insanity and found himself in a mental institution. Under the circumstances, he was not in a position to contend that there was anything arbitrary or capricious on the part of the superintendent of Saint Elizabeths Hospital in refusing to certify him for release.

Overholser v. Russell, 108 U.S.App.D. C. 400, 283 F.2d 195, is distinguishable because the defendant in that case was suffering from psychoneurosis, which is generally regarded as a form of insanity. That case did not involve a sociopath.

■■■ It may not be inappropriate to observe that counsel for defendants in borderline cases in which the offense is of a type that would carry at most a short term of imprisonment, frequently do their clients a disservice when they request a mental examination. Often the outcome of the examination is that the defendant is found competent and yet he will have been incarcerated for several months in the criminal ward of a mental hospital admidst madmen while the study of his mental state is being conducted; and if he is eventually convicted and sentenced to imprisonment, his incarceration is prolonged that much longer. On the other hand, if he is acquitted on the ground of insanity, he runs the risk of being incarcerated for a much longer period than might have been the case if he were sentenced to a short term in jail. Counsel for defendants are advocates and must have the courage to represent their clients' best interests within the orbit of ethical practice. They must not be deterred by fear of criticism if they would act according to the highest traditions of the bar. It is not their function to vindicate the public interest. This is the duty of the United States Attorney, whose position is not that of a partisan advocate. If the defendant is actually in need of mental treatment, his counsel would serve him better by securing treatment for him on the civil side of a mental institution, possibly even as a voluntary patient, if and when an opportunity to do so arises. Mental examinations and the defense of insanity are better reserved for capital cases, as well as for cases in which the defendant runs the risk of being sentenced to imprisonment for a long term. . These comments are not at all inconsistent with the decision of the Court of Appeals in Overholser v. Lynch, D.C. Cir., 288 F.2d 388. That case holds that a trial judge has discretion to refuse to accept a plea of guilty if he is of the opinion that the defendant is mentally incompetent. It involved a defendant who was a manic-depressive of the manic type,—a person clearly insane. That opinion does not intimate that it is the duty of defense counsel to interpose the defense of insanity or to request a mental examination, irrespective of the defendant's best interests.

The court finds and concludes that the respondent's refusal to file the statutory certificate that would lead to the release of the petitioner from Saint Elizabeths Hospital, is arbitrary and capricious; that the petitioner is free of mental disease and mental defect; that, therefore, he cannot be dangerous by reason of any mental disease or mental defect; and that he is entitled to an unconditional discharge from the hospital. The writ is sustained and the release of the defendant ordered. The release will be stayed for ten days to enable the

Government to bring any civil or other proceedings to test the sanity of the petitioner if it deems it wise to do so. This opinion will constitute the findings of fact and conclusions of law. Counsel will submit proposed order.