Winfred OVERHOLSER, Appellant

v.

Herbert T. O'BEIRNE, Appellee.

No. 16352.

United States Court of Appeals District of Columbia Circuit.

Argued June 28, 1961.

Decided Oct. 19, 1961.

Petition for Rehearing En Banc Denied En Banc June 8, 1962.

Mr. Harry T. Alexander, Asst. U. S. Atty., at the time of argument, with whom Messrs. David C. Acheson, U. S. Atty., and Charles T. Duncan, Asst. U. S. Atty., were on the brief, for appellant. Mr. Carl W. Belcher, Asst. U. S. Atty., at the time the record was filed, and Mr. Nathan J. Paulson, Asst. U. S. Atty., also entered appearances for appellant.

Mr. Alan Kay, Arlington, Va. (appointed by the District Court), for appellee.

Before EDGERTON, DANAHER and BURGER, Circuit Judges.

BURGER, Circuit Judge.

This is an appeal by Dr. Winfred Overholser, Superintendent of St. Elizabeths Hospital, Washington, D. C., from an order in a habeas corpus proceeding directing release of Herbert T. O'Beirne, who had been committed to his custody under § 24–301, D.C.Code, following a verdict of not guilty by reason of insanity on a larceny charge.[1] Thereafter he unsuccessfully sought his release on four occasions. Early in 1961 a fifth[2] petition for writ of habeas corpus was filed requesting, among other things, the appointment of counsel and independent psychiatric examination. The District Court granted the petition, appointed counsel to represent appellee and appointed a private psychiatrist, Dr. J. R. Cavanagh, to conduct an examination and report to that court. Dr. Cavanagh's professional credentials are well recognized.

Appellant, Superintendent of St. Elizabeths Hospital, in his return certified that O'Beirne "has not recovered from his abnormal mental condition and requires further treatment before he can be released into the community." On three prior occasions appellant as Superintendent of St. Elizabeths had filed returns in substantially the same form describing O'Beirne's abnormal mental condition as sociopathic personality disturbance. Prior to the hearing now under review, Dr. Cavanagh made and reported a diagnosis of the same basic condition —sociopathic personality disturbance, antisocial type.

Before undertaking an examination of the evidence in relation to the findings, it may be useful to recall the reasons for confinement of persons found not guilty by reason of insanity. While the statute making such confinement mandatory is recent,[3] its antecedents go back more than a century. As early as Hadfield's case,[4] and ever since then, courts acting under their inherent powers or under statutes have ordered hospital confinement of persons who were relieved of criminal responsibility because of their mental condition when the criminal act was done. This was not for punishment since the very purpose of providing such a verdict was to excuse the act and relieve the actor from penalties. In its earliest development, confinement was primarily for the protection of society, but as medical knowledge increased and rehabilitation therapy developed more and more emphasis has been placed on the restoration of the subject to normal life free from the stigma of a criminal record. Roughly 1/3 of those committed to St. Elizabeths Hospital since 1954 under this statute have been released, including

---

1. A complaint filed in Municipal Court had charged O'Beirne with *grand larceny* of three wrist watches and two rings, totally valued at twelve hundred dollars ($1200). The United States Attorney entered a nolle prosequi upon the felony charge and caused to be filed an Information charging O'Beirne with petit larceny of the same items and O'Beirne then entered a plea of guilty. Later his guilty plea was withdrawn and changed to not guilty; but this was after the grand larceny charge had been dismissed and a new complaint would have been required to try him on that charge. O'Beirne's commitment followed on October 18, 1957.

2. Upon appeal from denial of the last preceding petition for a writ of habeas corpus we remanded to the District Court to conduct a hearing "so that appellant may have an adequate opportunity to attempt to establish that he was not given a fair trial, under the principles applicable in habeas corpus cases." See Judge Washington's opinion. O'Beirne v. Overholser, 1960, 109 U.S.App.D.C. 279, 281, 287 F. 2d 133, 135. Thereafter the District Court heard O'Beirne on this issue and concluded that he "had a fair trial and was lawfully committed to Saint Elizabeths pursuant to 24 D.C.Code, Section 301, as amended." (Findings Mar. 10, 1961.) No appeal was taken.

3. The mandatory provisions of § 24–301, D.C.Code (Supp. VIII 1960) were adopted in 1955 shortly after the decision of this court in Durham v. United States, 1954, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430.

4. Trial of James Hadfield, 27 Howell's State Trials 1281 (K.B. 1800).

eight who had committed homicide.[5] E. g., Hough v. United States, 1959, 106 U. S.App.D.C. 192, 271 F.2d 458.

The *twofold* purpose of the mandatory hospital confinement must never be overlooked, first, recovery of the patient and second, protection of society and the patient. To ignore the need for both protections or to equate this "protective" hospitalization with punishment confuses the issue and does a grave disservice to the broad social purposes of the statute, as well as the objectives of our rule on criminal responsibility. That the available hospitals may have too few psychiatrists or inadequate facilities or that they may not use the appropriate techniques, or that some may consider mental institutions worse than prisons, or that it is thought by some that civil commitment standards suggested by the dissent should be used—all of these factors are the business of the legislative, not the judicial branch of government if the statute is valid. Unless we are to hold that § 24–301 of the D.C.Code violates the Constitution—and we have recently[6] said that it does not—our responsibility is to apply the statute to accomplish its plain objectives.

Inherent in the statutory scheme, whether we like it or not, is the proposition that one who is "incurably insane" *and* "incurably dangerous"—if there are such—may be hospitalized indefinitely.[7]

For such cases nothing less was intended by Congress and nothing less will protect the patient and society from the hazards involved. The statute expressly makes the safeguards of the ancient process of habeas corpus available to test the subject's condition and detention at any time, subject, of course, to considerations such as were thoroughly canvassed in Stewart v. Overholser, 1950, 87 U.S.App. D.C. 402, 406, 186 F.2d 339, 343 (en banc). Congress in adopting § 24–301 in 1955, and providing for the availability of habeas corpus at any time, upon a proper showing, undoubtedly had in mind as governing, 18 U.S.C. 4241 et seq.

██ Under standards established in a series of cases beginning with Overholser v. Leach,[8] we have construed § 24–301 (g) as requiring the petitioner who seeks release without the statutory medical certification of recovery to show (1) that he has recovered his sanity and (2) that such recovery has reached the point where he has no abnormal mental condition which in the reasonably foreseeable future would give rise to danger to the petitioner or to the public in the event of his release. The mere fact that a person so confined has some dangerous propensities does not, standing alone, warrant his continued confinement in a government mental institution under § 24–301 D.C.Code. The dangerous propensities, as we have noted, must be related to or

5. Dr. Overholser reports that from 1955 to June 30, 1961, 283 persons had been found not guilty by reason of insanity and committed under § 24–301; 92 had been released either unconditionally or on conditions. Report from Dr. Winfred Overholser, superintendent of St. Elizabeths Hospital, to Mr. Joseph W. Stewart, Clerk of this Court, dated August 3, 1961, and on file in the Clerk's File of this case.

6. Ragsdale v. Overholser, 1960, 108 U.S. App.D.C. 308, 281 F.2d 943.

7. Under 18 U.S.C. §§ 4244–4248, it has been held that one charged with crime but not competent to stand trial may be held indefinitely in the custody of the Attorney General if it develops that he is incurable and that this is not a denial of due process. See exhaustive opinions of Judge

Ridge in Craig v. Steele, D.C.W.D.Mo. 1954, 123 F.Supp. 153; Kitchens v. Steele, D.C.W.D.Mo.1953, 112 F.Supp. 383; Higgins v. McGrath, D.C.W.D.Mo. 1951, 98 F.Supp. 670. In the case of confinement under 18 U.S.C. §§ 4244–4248 there is only a charge, but no judicial determination that the accused has committed a proscribed act, as is inherent in a verdict of not guilty by reason of insanity.

8. Ragsdale v. Overholser, 1960, 108 U.S. App.D.C. 308, 281 F.2d 943; Overholser v. Russell, 1960, 108 U.S.App.D.C. 400, 283 F.2d 195; Starr v. United States, 1958, 105 U.S.App.D.C. 91, 264 F.2d 377; Overholser v. Leach, 1958, 103 U.S.App. D.C. 289, 257 F.2d 667, certiorari denied 1959, 359 U.S. 1013, 79 S.Ct. 1152, 3 L. Ed.2d 1038.

arise out of an abnormal mental condition. See Starr v. United States, 1958, 105 U.S.App.D.C. 91, 264 F.2d 377. That abnormal mental condition may be the precise mental condition which constituted the basis for his acquittal or it may be a residual condition remaining in a patient who has improved.

In the Leach case, as here, release was sought by habeas corpus and the District Court after hearing ordered Leach's discharge. In reversing the District Court, Judge Washington speaking for a unanimous court, including Judge Edgerton, said:

> "The test of this statute is not whether a particular individual, engaged in the ordinary pursuits of life, is committable to a mental institution under the law governing civil commitments. * * * *Those laws do not apply here.* This statute applies to an exceptional class of people —people who have committed acts forbidden by law, who have obtained verdicts of 'not guilty by reason of insanity,' and who have been committed to a mental institution pursuant to the Code. People in that category are treated by Congress in a different fashion from persons who have somewhat similar mental conditions, but who have not committed offenses or obtained verdicts of not guilty by reason of insanity at criminal trials. The phrase 'establishing his eligibility for release,' as applied to the special class of which Leach is a member, means something different from having one or more psychiatrists say simply that the individual is 'sane.' *There must be freedom from such abnormal mental condition as would make the individual dangerous to himself or the community in the reasonably foreseeable future.*" (Footnotes omitted.) (Emphasis added.) Overholser v. Leach, 1958, 103 U.S.App.D.C. 289, 291–292, 257 F.2d 667, 669–670.

Findings of the District Court

The District Court made no separate formal findings of fact but at the conclusion of the opinion stated:

> "The court finds and concludes that the respondent's refusal to file the statutory certificate that would lead to the release of the petitioner from Saint Elizabeths Hospital, is arbitrary and capricious; that the petitioner *is free of mental disease* and mental defect; that, *therefore, he cannot be dangerous by reason of any mental disease or mental defect;* and that he is entitled to an unconditional discharge from the hospital. The writ is sustained and the release of the defendant ordered. The release will be stayed for ten days to enable the Government to bring any civil or other proceedings to test the sanity of the petitioner if it deems it wise to do so. This opinion will constitute the findings of fact and conclusions of law. * * * *" (Emphasis added.) O'Beirne v. Overholser, D.C.D.C.1961, 193 F.Supp. 652, 661–662.

There is no finding that O'Beirne will not be dangerous in the reasonably foreseeable future but only a finding that "he *cannot* be dangerous *by reason of any mental disease,*" because he has no mental disease. This finding, of course, rests on the District Court's conclusion that sociopathic personality disturbance is not a mental disease. Whether this theory is correct or not, it has been rejected by a majority of this court. See Blocker v. United States, 1959, 107 U.S.App.D.C. 63, 274 F.2d 572. See also discussion of classification of this condition in Blocker v. United States, 1961, 110 U.S.App.D.C. 41, 47–50, 288 F.2d 853, 859–862.

The threshold question is whether the District Court's findings meet the standards of § 24–301 as construed by a unanimous court in the Leach case, supra. It is significant that in this court's effort to emphasize the difference between standards for competence to be tried, standards of criminal responsibility and

standards for release from St. Elizabeths we said: "Thus, even though Leach's mental health may have improved, if there remains an abnormal mental condition which is certified as a source of potential danger, he is to be retained in custody under Section 24–301." 103 U.S. App.D.C. 289, 292, note 3, 257 F.2d 667, 670, note 3. A comparison of the standards we have defined for release under § 24–301 with the challenged findings of fact discloses a failure to comply with the Leach case standards.

However, even though erroneous standards were applied by the District Court, we can appropriately look to see whether the evidence is sufficient to sustain the findings required by the statute and by our decisions, that is: (a) evidence that appellee has recovered to the point where he is free from an abnormal mental condition and (b) evidence that his release would not expose appellee or the public to danger in the reasonably foreseeable future.

### Evidence on the Issue of Recovery

■ All of the evidence presented by the government is to the effect that O'Beirne is presently suffering from a mental disease. The record shows that the diagnosis at an earlier date was that he suffered from a psychosis; the present diagnosis is that he suffers from sociopathic personality disturbance, antisocial reaction.[9] The opinions of the government psychiatrists are expressed against the background of a long commitment in St. Elizabeths Hospital interrupted by intervals when O'Beirne escaped. The evidence offered by O'Beirne on the issue of the present state of his mental health is found in part in Dr. Cavanagh's prehearing written report which states:

"The diagnosis in this case is sociopathic personality disturbance, anti-social reaction.

" * * * According to usual diagnostic standards, this case is, I believe, properly classified as *Sociopathic Personality Disturbance, Antisocial Reaction.* * * * "

He explains his diagnosis more fully as

"a condition which is characterized principally by behavior disorders rather than by any particular physical or emotional disturbance manifested or felt by the patient. It is classified in the American Medical Association [sic, American Psychiatric Association?] nomenclature, in that portion dealing with mental diseases, along with several other disturbances."

Dr. Cavanagh then went on to make clear his disagreement with the St. Elizabeths Hospital on the issue of classification of "sociopathic personality disorders" as "mental diseases" especially in the context of a criminal case. He said a personality disturbance or disorder was not a mental illness or disease in his opinion.[10] He also indicated his view that there is almost no cure for a sociopathic personality. Dr. Cavanagh did not express an opinion that O'Beirne is presently of a normal mental condition. In answer to the question of whether O'Beirne's mental condition "is an abnormal mental condition" he said:

"I would certainly not believe that Mr. O'Beirne is like the average citizen in the United States. *I have*

---

9. It was shortly after appellee's 1957 commitment that St. Elizabeths Hospital adopted nomenclature and classification of sociopathic personality as a "mental disease." See In re Rosenfield, D.C.D.C. 1957, 157 F.Supp. 18. Appellee was diagnosed as a sociopathic personality approximately one year later. See also Rosenfield v. Overholser, 1958, 104 U.S. App.D.C. 322, 262 F.2d 34.

10. There is a deep cleavage among psychiatrists on both nomenclature and classification. Many reject the view that sociopathic or psychopathic personality is a "mental disease" or that it per se indicates lack of capacity to control behavior. See Blocker v. United States, 1961, 110 U.S.App.D.C. 41, 47–48, 288 F. 2d 853, 859–860. We note that the term sociopathic personality is considered substantially synonymous with the older term "psychopathic personality."

merely said that I don't think that what he shows constitutes a disease. It constitutes a personality disorder, a personality disturbance, rather, which is acquired through his method of living and so forth and which is manifested only by behavior. * * I have merely said that he has not disease in the sense that I understand disease. (Emphasis added.)

* * * * * *

"Well, if you are going to consider this a mental condition, I am not sure that I would. * * * I would consider these to be more emotional disturbances than mental." (Emphasis added.)

This witness was very precise in his testimony, making it clear his disagreement was with the "label" and classification of appellee's condition; he agrees with the government psychiatrists that appellee has a "sociopathic personality disturbance, antisocial reaction"; he does not agree that this is or should be considered a "mental disease."

With respect to the question of whether O'Beirne presently has, in terms, an "abnormal mental condition" appellee offered no evidence. On this score there is no genuine conflict.[11] Moreover, this court has held that a person suffering from "sociopathic personality disturbance, antisocial reaction"[12] has an "abnormal mental condition." See Overhol-

ser v. Leach, supra. [103 U.S.App.D.C. 289, 257 F.2d 670.]

Viewing the evidence as a whole and drawing the inferences most favorable to O'Beirne but against the background of his extensive criminal record, 12 or 14 confinements[13] for treatment in government hospitals for drug and alcohol addiction, his long psychiatric history and the testimony of the psychiatrists in the latest hearing, it would seem impossible to say he does not now have an "abnormal mental condition" within the meaning of the Leach case.

But our conclusion that the record compels a holding that O'Beirne has an abnormal mental condition does not dispose of the matter. We must also determine whether there is evidence to support the finding that appellee's release will not expose him or the public to danger in the reasonably foreseeable future.

Evidence as to Dangerous Propensities

The government's evidence on this score is that O'Beirne will endanger both himself and the public if he is released. The evidence that O'Beirne's release would be dangerous to him and to the public is overwhelming. Every government psychiatrist so testified and O'Beirne's expert testimony does not attempt to contradict this. As to his possible return to drug addiction Dr. Cavanagh said that "if he has been off of drugs since 1957 it would be most un-

11. The District Judge acknowledged this: "Then there is not any difference of opinion in the diagnosis between the psychiatrists for the respective sides here. The only difference of opinion, if any, is what inference is to be drawn from the diagnosis." Record, p. 61.

12. Our individual views as to whether a sociopathic personality disorder should, per se, exculpate an accused from responsibility for criminal behavoir when the expert testimony is undisputed is beside the point; this court under the combined application of Douglas v. United States, 1956, 99 U.S.App.D.C. 232, 239 F.2d 52, Durham and the Blocker cases seemingly has resolved that question in the affirmative, three judges expressing a contrary view. See Blocker v. United

States, 1959, 107 U.S.App.D.C. 63, 274 F.2d 572 and my concurring opinion in Blocker v. United States, 1961, 110 U.S. App.D.C. 41, 288 F.2d 853, 857.

13. O'Beirne's record includes convictions, commencing in 1936, for grand larceny, petit larceny, false pretenses, vagrancy, drunkenness, disorderly conduct, draft evasion, obtaining narcotics by forgery, forging and uttering, and other violations of the narcotics laws, as well as 12 or more commitments to the United States Public Health Service Hospital at Lexington, Kentucky. Manifestations of abnormal mental condition may take many forms. See Misenheimer v. United States, 1959, 106 U.S.App.D.C. 220, 271 F.2d 486, certiorari denied 1960, 361 U.S. 971, 80 S.Ct. 603, 4 L.Ed.2d 550.

likely that he would go back * * *. However, this is only a guess." On direct examination he was asked:

"Q. Dr. Cavanagh, taking into consideration the petitioner's past history with drug addiction, his criminal record, and the fact that he escaped from St. Elizabeths on four or five different occasions, do you have an opinion, Doctor, as to whether or not the petitioner in the reasonable [sic] foreseeable future would be dangerous to himself or to others if he were released? A. I would have to answer that question in this way: I have testified that I do not believe that Mr. O'Beirne has a *mental illness* and, therefore, I would have to qualify my answer by saying that as a psychiatrist, since I feel he has no mental illness, I don't think that he is likely to go to any of these things *because of mental illness*. What his behavior is going to be in the future *I have no way of knowing, I have no crystal ball.* But I can only say that since he is without disease, this would be the question which I would expect to answer, that he has no *illness* which will bring these things *necessarily* about." (Emphasis added.)

This answer, out of context, bears some analysis. The witness was scrupulously candid with the court and was saying only this: that since he does not believe O'Beirne has a *mental illness,* as he understands that term, he does not believe O'Beirne will be dangerous *because of a mental illness.* But the witness categorically refused to predict what O'Beirne's behavior would be in the future. When we consider his testimony in the light most favorable to O'Beirne we find the appellee's case gains little support, if any, on his claim that if released he will not be dangerous to himself or others.

Considering all the evidence on both of the crucial issues the record thus shows:

(1) All medical witnesses agree that O'Beirne suffers from sociopathic personality disturbance, antisocial reaction. The government expert witnesses state this is a "mental disease" and hence plainly an "abnormal mental condition." The court appointed witness does not consider this a "mental disease."

(2) The government's medical witness states categorically that release at this time will expose O'Beirne and others to danger of repeated antisocial behavior and criminal acts; O'Beirne's court appointed expert refused to express a fixed opinion on his future behavior.

On this record therefore, the basic findings essential to release have not been made.

The issue is not whether O'Beirne now has a "mental disease" but whether he has an "abnormal mental condition" which will cause him to be dangerous to himself or others if released.[14] The difficulty is partly one of semantics and "labels" but it is also deeper than that. The District Judge has used a "disease-defect" standard to determine eligibility for release but § 24–301 does not use such standards and the Leach case has already defined what the statute means. The District Court must apply those standards as defined in the Leach case.

As we have pointed out in the Leach and Ragsdale opinions, it must be presumed, and certainly hoped, that a confinement in St. Elizabeths after a verdict of not guilty by reason of insanity, will bring about an improvement and recovery of the individual so he can resume a place in society without danger to himself or the public. Underlying our opinions in the Leach, Ragsdale and Starr cases is recognition of the obvious that a recovery from mental ills does not come overnight; we are not dealing here with

---

14. In this context it is immaterial that St. Elizabeths' staff changed the official classification of sociopathy within the mental disease category *after* appellee's commitment. The critical issue here is his *present* condition and whether his release *now* will be dangerous.

an affliction like a diseased appendix where a surgical operation and a brief convalescence are almost invariably followed by a recovery. Recovery from behavior disorders or mental ills, by whatever names or labels we use, is slow and dubious at best and is rarely as predictable as the course of a physical disease. Judge Washington's choice of words "abnormal mental condition" in Leach was not casual or thoughtless, but studied and calculated. That concept means that a patient like O'Beirne may progress from a true and undisputed "mental disease" such as a psychosis, which he formerly had, to his present undisputed state of "sociopathic personality disturbance, antisocial reaction." But that result does not qualify him for release; he cannot be released until the process of recovery reaches the point that his release will not expose him or others to danger. We emphasized this in the Ragsdale opinion in saying

> "A patient may have improved materially and appear to be a good prospect for restoration as a useful member of society; but if an "abnormal mental condition" renders him potentially dangerous, reasonable medical doubts or reasonable judicial doubts are to be resolved in favor of the public and in favor of the subject's safety. * * *" Ragsdale v. Overholser, 1960, 108 U.S.App.D.C. 308, 312, 281 F.2d 943, 947.

The dissenting opinion does not meet the central issue in the case but rather asserts in essence that 3½ years in St. Elizabeths Hospital constitutes too much confinement for a one year offense.[15] This approach strikes at the very heart of the effort to rehabilitate the maladjusted offender. The purpose of the standard of criminal responsibility, adopted for this jurisdiction in 1954, did more than broaden the area of exculpation from criminal responsibility; it also contemplated rehabilitation in a *medical* rather than penal context. Prompt congressional enactment of the mandatory confinement provision of § 24–301, D.C. Code made this certain.

It is fundamentally wrong, we think, to measure the treatment needs of a sick person by the length of the penal sentence he would have received had he not been excused from punishment, for in the eyes of the law such a person has committed no *crime*. Statutes tell us how long a sentence should be but neither statutes nor medical books can tell us how much hospitalization is needed to effect rehabilitation. The dissenting opinion seems to regard O'Beirne as "paying his debt to society" by his stay in St. Elizabeths Hospital when the truth is that this is in no sense a "punishment." If any debt is being paid, it is precisely the reverse of this; it would be more nearly correct to say society is discharging an obligation to O'Beirne in the procedure established by Congress to assure him psychiatric care at public expense.

The dissenting opinion also seeks to introduce into the process civil standards of committability by the Mental Health Commission in direct conflict with the plain congressional intent expressed in § 24–301. It is one thing to argue that confinement after a verdict of not guilty by reason of insanity, without a special and contemporaneous hearing, is a violation of due process; it is quite another proposition to say that as soon as the hospital confinement exceeds the maximum sentence for a guilty person, we will review the problem and shift into a civil proceeding not designed, as the Leach opinion pointed out, to deal with persons who have committed dangerous acts. The civil commitment process while available for some kinds of aberrant conduct was not established to deal with persons whose dangerous propensities and mental illnesses come into focus and relevancy when they commit what otherwise would

---

15. We must remember that O'Beirne was charged with the more serious offense of grand larceny which was dismissed when he entered a guilty plea to the "one year offense." See Note 1, supra.

be criminal acts. O'Beirne is not an individual

"engaged in the ordinary pursuits of life, [who] is committable to a mental institution under the law governing civil commitments. * * * *Those laws do not apply here.*" Overholser v. Leach, supra.

Moreover, as pointed out in the Leach and Ragsdale cases, the person confined is not by any means without a remedy. He is free to challenge his confinement by resort to habeas corpus at any time.[16] After all, the Great Writ has long been regarded as the ultimate among the safeguards of individual liberty and the constitutionality of § 24–301 was saved in part at least by the constant availability of habeas corpus in a proper case. See also Curry v. Overholser, 1960, 109 U.S. App.D.C. 283, 287 F.2d 137.

In Taylor v. United States, 1955, 95 U. S.App.D.C. 373, 379, 222 F.2d 398, 404, we held that the jury must be told what becomes of an accused who is found not guilty by reason of insanity and Judge Edgerton, speaking for the court, said:

"* * * we think that when an accused person has pleaded insanity, counsel may and the judge should inform the jury that if he is acquitted by reason of insanity *he will be presumed to be insane* and may be confined in a "hospital for the insane" as long as "the public safety and * * [his] welfare" require. Though this fact has no theoretical bearing on the jury's verdict it may have a *prac-*

*tical* bearing." (Emphasis added.) (Footnotes omitted.)

It seems reasonably clear that the "practical bearing" Judge Edgerton referred to in the context of the issues of the Taylor case[17] was the greater likelihood that a jury would accept the claim of insanity if they knew the accused would not be set free without some medical attention being given him because of his claimed abnormal mental condition. In Lyles v. United States, 1957, 103 U.S. App.D.C. 22, 254 F.2d 725, certiorari denied, 1958, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067, we reaffirmed this requirement that the jury be told of the mandatory confinement in a mental hospital.

The position expressed by Judge Edgerton in his dissent is, of course, sharply at odds with his position in the Taylor and Lyles cases. Were we to adopt his present position it would be incumbent upon the trial judges to explain to the jury that "within a reasonable period of time which will vary from case to case" continued hospital confinement under § 24–301 would require a civil proceeding under the Mental Health Act, D. C.Code 1951, § 21–301 et seq. It is at least arguable that as a "practical" matter such an enlarged cautionary instruction could well cause jurors to be less willing to reach a verdict of not guilty by reason of insanity. The underlying purpose of § 24–301 and the instruction called for by the Taylor and Lyles cases would thus be thwarted if the jurors should render a guilty verdict on an accused

16. The suggestion in the dissent that O'Beirne has been confined without due process on the issue of his sanity is scarcely compatible with the record read in light of the terms of the governing statute as construed by this court. In the various hearings held on O'Beirne's petitions for habeas corpus the ultimate issue underlying the question whether the action of the hospital superintendent was arbitrary and capricious was whether O'Beirne had recovered his sanity and was then or in the foreseeable future likely to be dangerous. In each of the earlier hearings where the District Court

reached the merits there was before the court, in one form or other, the opinions of the St. Elizabeth's psychiatrists to the effect that O'Beirne had not recovered his sanity and was presently or potentially dangerous by reason of his mental condition. Hence in passing on the merits of the petitions there was an implicit finding by the District Court that O'Beirne had *not* recovered his sanity and that he was presently or potentially dangerous.

17. The Taylor case arose prior to the enactment of § 24–301 in its present mandatory form.

who in fact should be held not responsible because of insanity. We are not persuaded that the position of this court established in the Leach, Ragsdale and other cases, all very recent, should be abandoned.

In arguing that O'Beirne "was not found to have been insane" Judge Edgerton overlooks not only his own positions in the Taylor and Lyles cases, supra, but also appears to overlook or consider irrelevant the fact that O'Beirne affirmatively urged the defense of insanity upon the trial court, and it was his evidence that persuaded the court. His retained counsel offered as the only defense in O'Beirne's behalf psychiatric evidence that the defendant had been suffering from a mental disease at the time of the commission of the crime and that the crime was a product of this mental disease. The defense then rested. The government offered no evidence that O'Beirne was free of mental disease when the crime was committed. On the basis of this record Judge Scott then found O'Beirne not guilty by reason of insanity and ordered him committed to St. Elizabeths Hospital pursuant to § 24–301 D.C. Code as amended. See Findings of Fact and Conclusions of Law filed March 10, 1961, in Habeas Corpus 8–60, before Holtzoff, J., District Judge.

The suggestion that civil mental health commitment procedures, with their "greater procedural safeguards," are a more appropriate remedy seems to rest on the idea that O'Beirne committed a "non-dangerous offense." But to describe the theft of watches and jewelry as "non-dangerous" is to confuse danger with violence.[18] Larceny is usually less violent than murder or assault, but in terms of public policy the purpose of the statute is the same as to both. Larceny, assault and murder are all dangerous; they are simply different areas of prohibited conduct. Hence unless we are to ignore the objectives and policies of the statute in question, the release provisions must apply in the same way and with the same force to larceny without violence as to a crime of violence until Congress speaks otherwise. Of course the Superintendent of St. Elizabeths might well take into account, in making his appraisal of potential danger, the quality of the patient's abnormal mental condition as well as the history of conduct. But as we pointed out in Overholser v. Russell, 1960, 108 U.S.App.D.C. 400, 283 F.2d 195, a "bad check" passer at large endangers himself by exposure to additional violations and additional arrests, trials and confinements, to say nothing of the serious effect on the public of his predatory tendencies.

In the face of the opinions of psychiatrists on both sides that O'Beirne probably is not now committable under the civil procedures, the argument that he should not be held longer without a civil commitment is the familiar contention of those who "want to have it both ways." To yield to that view would mean that sociopathic personality disturbance constitutes a valid defense to a criminal charge but is not a basis for hospital confinement under § 24–301. However, whether O'Beirne is now committable under civil proceedings is not the issue. Congress has prescribed a procedure, this court has construed the statute, and we are not free to use a different procedure unless we are prepared to hold § 24–301 violates the Constitution. Ragsdale v. Overholser, note 6, supra.

Reversed.

EDGERTON, Circuit Judge (dissenting).

I think the District Court erred in finding that appellee had no mental disease or defect and also in finding that appellant's refusal to file a certificate was arbitrary. But, for other reasons, I agree with the District Court that there is no legal basis for appellee's present confinement and that he should be discharged from the hospital unless with-

18. The information charged that O'Beirne "with force and arms * * * 3 watches and 2 rings * * * did STEAL, TAKE AND CARRY AWAY * * *."

in ten days proceedings are brought to test his sanity. I would therefore affirm the court's order.

1. Though appellant was found "not guilty by reason of insanity" he was not found to have been insane. As Judge Fahy said in Overholser v. Lynch: "There was no finding of insanity such as underlay the assumption on which Orencia v. Overholser, 82 U.S.App.D.C. 285, 163 F.2d 763, was decided by this court." 109 U.S.App.D.C. 404, 413 note 6, 288 F.2d 388, 397 note 6 (dissenting opinion), certiorari granted, 366 U.S. 958, 81 S.Ct. 1936, 6 L.Ed.2d 1252. See O'Beirne v. Overholser, 109 U.S.App. D.C. 279, 287 F.2d 133.

The Supreme Court ruled in 1895 that "If the whole evidence, including that supplied by the presumption of sanity, does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offence charged. His guilt cannot be said to have been proved beyond a reasonable doubt * * *." Davis v. United States, 160 U.S. 469, 488, 16 S.Ct. 353, 358, 40 L.Ed. 499. In other words, in order to be entitled to an acquittal by reason of the insanity question, the accused need not be found to have been insane. If, because of reasonable doubt as to his sanity, he is not found to have been sane, he must be acquitted. We have applied this rule many times. Blocker v. United States, 110 U.S.App.D.C. 41, 288 F.2d 853, and cases cited. The phrase "not guilty by reason of insanity" is used in our courts in the sense of "not guilty by reason of the insanity question", i. e., not guilty because sanity was not proved beyond reasonable doubt. Durham v. United States and Blocker v. United

States illustrate this usage. In both those cases we said the jury should be told in substance: "Unless you believe beyond a reasonable doubt either that [the accused] was not suffering from a diseased or defective mental condition, or that the act was not the product of such abnormality, you must find the accused not guilty by reason of insanity."[1]

2. The mandatory commitment requirement and the corresponding release requirements of the District of Columbia Code, read literally, apply only when the accused is found at the trial to have been insane at the time of the offense, and therefore do not apply in the present case. The Code provides that "If any person tried upon an indictment or information for an offense, or tried in the juvenile court of the District of Columbia for an offense, is *acquitted solely on the ground that he was insane* at the time of its commission, the court shall order such person to be confined in a hospital for the mentally ill." 69 Stat. 610 (1955), D.C.Code § 24–301(d) (Supp. VIII 1960), (emphasis added). Section 24–301(e) requires, for the person's release, a certificate by the superintendent of the hospital "(1) that such person *has recovered his sanity,* (2) that, in the opinion of the superintendent, such person *will not in the reasonable future be dangerous to himself or others * * *.*"[2] Only one who was formerly insane can have "recovered his sanity".

And the expression "will not in the reasonable future be dangerous to himself or others" seems to show that Congress was speaking only of persons who had committed dangerous offenses. O'Beirne had not committed a dangerous offense. Petty larceny, for which he was tried, is theft of property worth less than $100.[3] The maximum term of

1. 94 U.S.App.D.C. 228, 241, 214 F.2d 862, 875, 45 A.L.R.2d 1430; 110 U.S.App.D.C. 41, 42, 288 F.2d 853, 854.

2. This paragraph of the statute also provides that the court in its discretion may hold a hearing and "if the court finds that such person *has recovered his sanity and will not in the reasonable future*

*be dangerous to himself or others"*, the court shall order his release. (Emphasis added.)

3. Not $1,200, which would be grand larceny. 67 Stat. 99 (1953), as amended, D.C. Code §§ 22–2201, 22–2202 (Supp. VIII 1960).

imprisonment authorized by Congress for petty larceny is one year.[4] This would hardly be appropriate for a "dangerous" offense. In this respect the present case is much like Overholser v. Lynch, supra, in which Judge Fahy, dissenting, said: "The offenses charged to appellee, the cashing of two 'bad checks' of $50 each, were not of a dangerous character within the meaning of section 301(e). Therefore the release conditions of that section do not apply in appellee's case and his continued restraint cannot be justified under the criteria of that section." 109 U.S.App.D.C. at page 413, 288 F.2d at page 397.

3. It may be that the words "was insane" in § 24–301(d) and the words "has recovered his sanity" in § 24–301(e) should not be read literally. In Overholser v. Leach we did not read them literally, but held that in order to establish eligibility for release under § 24–301(e) by a writ of habeas corpus, "There must be freedom from such abnormal mental condition as would make the individual dangerous to himself or the community in the reasonably foreseeable future." 103 U.S.App.D.C. 289, 292, 257 F.2d 667, 670. Perhaps Congress would have chosen, if it had considered the matter, to make § 24–301 apply to persons who are acquitted only because there is reasonable doubt as to their sanity. But "There is no reason to suppose Congress intended that a person not accused of any dangerous offense and not found to be of unsound mind should be held indefinitely against his will in a mental institution * * *." Dissenting opinion of Judge Fahy in Overholser v. Lynch, supra, 109

U.S.App.D.C. at page 412, 288 F.2d at page 396. And if we are to interpret § 24–301 more broadly than its literal meaning, we should not go so far beyond its literal meaning as to raise serious constitutional doubts. If it be assumed that a person who is found to have done a dangerous act, and also is found to have been insane, may constitutionally be committed to a mental hospital until he "has recovered his sanity and will not in the foreseeable future be dangerous to himself or others", it does not follow that one who has not been found to have done a dangerous act and has not been found to have been insane may be restrained for a longer period than is reasonably required to determine in a civil proceeding whether there is reason to restrain him. Valid restraint of such a person for an indefinite period should depend "upon a finding, never yet made, that he is of unsound mind and not upon meeting the conditions for release applicable to persons committed under section 301(d)."[5] If it be consistent with due process to treat appellee's acquittal of petty larceny "by reason of insanity" as creating a temporary rebuttable presumption that he was insane and dangerous at the time of the offense, it does not follow that it is consistent with due process to confine him in a mental hospital for years or for life without any finding ever having been made, in any proceeding in any court, that he was insane.

4. Congress has made broad provisions for the civil commitment of insane persons in the District of Columbia. Either "the nearest relative or friend avail-

4. 50 Stat. 628 (1937), as amended, D.C. Code § 22–2202 (Supp. VIII 1960).

5. Dissenting opinion of Judge Fahy in Overholser v. Lynch, supra, 109 U.S.App. D.C. at pages 413–414, 288 F.2d at pages 397–398.
"Since an accused is entitled to be acquitted on the ground of insanity although the evidence may merely have led the jury to entertain a reasonable doubt as to his sanity when the offense occurred, * * * due process may well require * * * that within a reasonable time,

which will vary from case to case, continued confinement be made dependent upon civil commitment proceedings, with their greater procedural safeguards, and not left indefinitely to rest alone upon commitment under section 24–301 * * *." Concurring opinion of Judge Fahy in Ragsdale v. Overholser, 108 U.S.App.D.C. 308, 315, 316, 281 F.2d 943, 950, 951.
Judge Bazelon has expressed the same view, concurring in the result in Overholser v. Russell, 108 U.S.App.D.C. 400, 404, 283 F.2d 195, 199.

able", or any one of various public officers, "may apply for * * * an order of commitment * * * for any alleged insane person in the District of Columbia, by filing in the District Court of the United States for the District of Columbia a verified petition therefor, containing a statement of the facts upon which the allegation of insanity is based." 53 Stat. 1293–1294 (1939), D.C.Code § 21–310 (1951). Proceedings may likewise be "instituted upon petition of the commissioners of the District of Columbia to determine the mental condition of alleged indigent insane persons and persons alleged to be insane, with homicidal or otherwise dangerous tendencies * * *." 33 Stat. 740 (1905), D.C.Code § 21–306 (1951). A Commission on Mental Health is directed to "examine alleged insane persons * * * and make reports and recommendations to the court as to the necessity of treatment, the commitment, and payment of the expense of maintenance and treatment of such insane persons." 52 Stat. 625 (1938), as amended, D.C.Code § 21–308 (1951). Provision is made for a jury trial if demanded. "If the judge be satisfied that the alleged insane person is in-

sane, or if a jury shall so find, the judge may commit the insane person as he in his discretion shall find to be for the best interests of the public and of the insane, person." 53 Stat. 1296 (1939), D.C.Code § 21–315 (1951).

The word "insane" in these statutes is not limited to psychotics. Dr. Overholser informs us that persons in the following nonpsychotic categories, among others, may be civilly committed; "mental deficiency, psychoneurosis, *personality disorder*, and certain cases diagnosed as chronic brain syndrome with psychoneurotic reaction". (Emphasis added.) He also informs us that 7% of all District of Columbia resident admissions to St. Elizabeths in the fiscal year 1960 were diagnosed in one of the nonpsychotic groups, and that all these were involuntary civil commitments. Though it was not proved at appellee's trial for petty larceny that he was either insane or dangerous, there is much evidence that he is now both. I think the facts now before us strongly suggest that his personality disorder, a "sociopathic personality disturbance, antisocial type", is serious enough to permit his commitment as insane in a civil proceeding.[6] But wheth-

6. Dr. Cavanagh does not regard a sociopathic personality disturbance as a mental disease, and accordingly testified that he thought a person with a disturbance "of the type that this petitioner has" would not be subject to commitment in a civil proceeding. On the other hand, Dr. Owens shares the official opinion of St. Elizabeths Hospital that such a disturbance is a mental disease, and his testimony makes it highly probable that if he had been asked, he would have said he thinks O'Beirne is subject to commitment in a civil proceeding, although he does not hold that opinion regarding all persons to whom the diagnosis "sociopathic personality disturbance, antisocial type" is applied. He distinguishes some such persons from others, as the following colloquy shows: "Q. A sociopath, Doctor, of an antisocial type, is he committable civilly? A. Well, I think this would depend on each individual case. The Court. But suppose you just have a diagnosis such as you have here, sociopathic personality disturbance, antisocial type, is that in itself sufficient to warrant commitment in a

civil procedure? The Witness. I do not think that it would be." In short, the bare generic diagnosis, without more evidence, is not enough. But regarding O'Beirne, there is much more evidence than the bare diagnosis, and Dr. Owens expressed a definite opinion about him. He was asked, "do you think that Mr. O'Beirne's condition is such as to warrant his confinement in John Howard Pavillion?" The "pavillion", I understand, is a maximum security part of St. Elizabeths Hospital. Dr. Owens replied: "I most certainly do at this time. As I explained, the most recent episode [was] when he was permitting other patients for a fee, usually charged in vodka, to leave the hospital and turning other more seriously ill patients out because he had a key in his possession. I certainly think this man * * * requires security." And if Dr. Klinger, Chief of St. Elizabeths "West Side Service", had been called as a witness, he would have testified "substantially that the man is suffering from a sociopathic personality disturbance, antisocial type, that it is a

er or not he can be committed in a civil proceeding, without such a proceeding there is in my opinion no legal basis for his continued confinement.

mental illness, and that he would be dangerous if released at the present time."

Cf. footnote 13 of the opinion of the court.